Johnny Lee BASS, by Mary LEWIS, Administrator of his Estate, Plaintiff-Appellee,

v.

Arthur WALLENSTEIN, Assistant Warden of Stateville Correctional Center, William Such, Medical Unit Administrator of Stateville Correctional Center, and First National Bank of Joliet, Executor of the Estate of Dr. Charles Hoffman,* Defendants-Appellants.

Nos. 83–2392, 83–2404.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 25, 1984.

Decided July 30, 1985.

Rehearing Denied Aug. 22, 1985.

---

* Defendant-appellant Dr. Charles Hoffman died while this appeal was pending. By order dated October 17, 1984, this court granted Dr. Hoffman's counsel's motion for leave to substitute the First National Bank of Joliet, Executor of Dr. Hoffman's Estate, as a defendant-appellant in this appeal.

Richard G. French, French, Rogers, Kezelis & Kominiarek, Chicago, Ill., for plaintiff-appellee.

Donald T. Bertucci, Chicago, Ill., for defendants-appellants.

Before HARLINGTON WOOD, Jr. and ESCHBACH, Circuit Judges, and SWYGERT, Senior Circuit Judge.

HARLINGTON WOOD, Jr. Circuit Judge.

In this section 1983 action claiming deprivations of decedent Johnny Lee Bass' eighth amendment right to be free from cruel and unusual punishment and his fourteenth amendment right not to be deprived of life without due process of law, the jury returned a verdict in favor of the administrator of Bass' estate in the amount of $250,000. The defendants found to be liable,[1] Wallenstein, Assistant Warden at Stateville Correctional Center in Joliet, Illinois ("Stateville"), Such, Medical Unit Administrator at Stateville, and Dr. Hoffman, a physician at the Stateville hospital, appeal from the district court's denial of their motions for judgment notwithstanding the verdict or, in the alternative, for a new trial, and for remittitur.

The case went to trial on plaintiff's second amended complaint, which alleged that Wallenstein and Such failed in their duty to create and implement an adequate emergency medical plan at Stateville and that Dr. Hoffman failed in his duty to provide emergency medical treatment; as a result of this deliberate indifference to the serious medical needs of Bass, the twenty-seven-year old died from cardiorespiratory arrest.

---

1. Defendants Rowe, Director of the Illinois Department of Corrections, Patmon, Medical Services Administrator of the Illinois Department of Corrections, and Brierton, former Warden of Stateville Correctional Center, were found not liable.

## I.

A detailed review of the evidence is necessary. Presented first is the evidence of the events of October 19 and 20, 1976, and then the evidence of the adequacy of the Stateville emergency medical plan.

## A.

Gary Devers, a correctional officer at Stateville, testified that he was working the 11:00 P.M. to 7:00 A.M. shift on October 19–20, 1976. At 11:30 P.M., Bass said he was feeling ill and asked for medical assistance. Devers phoned the hospital and spoke to medical technician Vadbunker, who told Devers not to send Bass to the hospital. Instead, Vadbunker sent two pills which Devers then gave to Bass. At approximately 2:00 A.M. on October 20, Bass told Devers that he had to get to the hospital. Devers again called Vadbunker, who refused to permit Devers to bring Bass to the hospital, stating that the pills should work. Devers stated that he did not challenge Vadbunker's actions because Captain Harralson, the midnight shift commander, previously had told Devers not to "bother" the medical technicians if they did not want to see inmates. At approximately 6:00 A.M., Bass told Devers that he was "really hurting." Devers phoned the hospital sometime between 6:35 A.M. and 6:40 A.M.; he spoke with medical technician Triola, who said he would take care of the problem. Devers, who went off duty at 6:50 A.M., recorded all these events in the logbook maintained in Cellhouse B West.

Walter Vadbunker testified that the emergency room logbook contained four entries for the midnight shift on October 19 and 20, 1976. None of these entries was made by Vadbunker and none concerned Bass. The initials of the medical technician who made the entries were "G.B." Vadbunker did not know who that person might be.

Medical technician Joseph Triola testified that he did not know Devers and that he did not receive a phone call regarding inmate Bass from someone identifying himself as Devers. He further testified that he first learned that Bass needed medical assistance at approximately 8:30 A.M. on October 20. He proceeded to Bass' cell, taking with him only a stethoscope. Triola checked Bass' carotid artery and began cardiopulmonary resuscitation ("CPR") in an attempt to revive him. Bass was neither intubated, catherized, nor put on an intravenous ("IV") line. Triola did not remember stating that Bass had a weak pulse or that there might be a slight heartbeat. Triola testified that it took three to four minutes to transport Bass to the hospital. Bass arrived there at 8:45 A.M.; Dr. Hoffman, who was already there, examined him. According to Triola, Dr. Hoffman then administered electric shock treatment. Triola prepared no report on the incident.

Two correctional officers, Martin Shifflet and Marshall Edwards, were present with Triola in Bass' cell. Shifflet testified that Triola examined Bass and indicated that he had a slight pulse. Shifflet further testified that at no time did Triola indicate that Bass was dead. Edwards testified that he observed Triola and Shifflet perform CPR and heard Triola say there might be a heartbeat. Edwards further testified that in examining Bass' eyes, he (Edwards) did not use any light to check pupil response.

Tommy Lee Cowans, an emergency medical technician at Stateville since 1975, was working the day shift (7:00 A.M. to 3:00 P.M.) on October 20, 1976. Cowans testified that Such advised him that an emergency case would be coming in. He further testified that when Bass was brought into the emergency room by Triola and two officers, he was cyanotic.[2] Cowans checked Bass' heartbeat and pulse, found none, and immediately began CPR. Triola, who was upset and "screaming" that he did not know what to do and that he "didn't know," was told by Cowans to be quiet. Cowans worked on Bass for approximately

---

**2.** Cyanosis is a bluish or purplish discoloration of the skin which results from deficient oxygen- ation of the blood.

forty-five minutes, which, he testified, he would not have done if Bass were obviously dead. At one point, Cowans testified that he was able to perform only mouth-to-mouth resuscitation and cardiac massage because, at that time, medical technicians were not permitted to administer any kind of injection or electric shock to a cardiac arrest patient. At another point, Cowans stated that he had not administered electric shock to a patient before Bass. Cowans further testified that while he was working on Bass, he observed Dr. Hoffman enter the emergency room; Cowans stated that fifteen minutes could have elapsed between the time Bass was brought into the emergency room and the time Dr. Hoffman arrived.[3]

Mary Hall, a registered nurse at Stateville, testified that she and correctional officer Blaine Voris were accompanying Dr. Hoffman on rounds in the second floor medical unit between 8:00 A.M. and 9:00 A.M. on October 20. She testified that while making rounds, Dr. Hoffman received a telephone call from Such. She heard Dr. Hoffman say that he was not to be spoken to in that manner. After the conversation, Dr. Hoffman left the second floor. She did not accompany him. Voris testified that while making rounds on the second floor of the hospital with Hall and Dr. Hoffman, he answered the telephone three times. The first call was from Mrs. Peterson, who asked to speak with Dr. Hoffman, indicating that it was an emergency. Dr. Hoffman answered the phone, and stated that the inmate should be sent to an outside hospital. Dr. Hoffman returned to his rounds. The telephone rang a second time. Sergeant Waller requested that Dr. Hoffman come down to the emergency room. Voris told Dr. Hoffman that Waller was calling regarding an emergency; Dr. Hoffman continued on his rounds. Officer Hayes then came to the second

floor, relaying to Voris the message that Such wanted Dr. Hoffman in the emergency room. Voris informed Dr. Hoffman, who continued on his rounds. The telephone rang yet a third time. The caller was Such, who wanted to speak with Dr. Hoffman. Dr. Hoffman answered and was heard by Voris to say that Such had no right to speak to him that way and that he had not been notified of an emergency. Dr. Hoffman then left the second floor unit.

Such testified that on October 20, 1976, he arrived at his office in the medical unit at Stateville at approximately 8:00 A.M. He then was informed of the emergency by Sergeant Waller. Officer Hayes was advised to contact Dr. Hoffman. Such later telephoned Dr. Hoffman and told him that an emergency required his presence in the emergency room; in fact, Such insisted that Dr. Hoffman come to the emergency room. Dr. Hoffman was huffy, even irate. Such testified that after his conversation with Dr. Hoffman, five to ten minutes passed before Dr. Hoffman entered the emergency room.

Dr. Hoffman testified that he was the only physician on duty on October 20, 1976 and that it was his duty to respond to all medical emergencies. Dr. Hoffman had no personal recollection of the events of October 20 or of the circumstances of Bass' death; he did not recall examining Bass or pronouncing him dead. A report written by Dr. Hoffman on October 20, 1976 following Bass' death indicated that he saw Bass between 8:50 A.M. and 9:00 A.M. that morning; that he provided no treatment; and that he merely examined Bass and pronounced him dead.

Dr. Edward Shalgos, a forensic pathologist who performed the autopsy on Bass on October 20, 1976 at the request of the Will County Coroner, testified that before performing the autopsy he telephoned State-

---

3. In an earlier deposition, Cowans had stated that Dr. Hoffman was waiting in the emergency room when Bass was brought there, and that Dr. Hoffman immediately began to "work on" Bass, intubating him, and administering electric shock treatment, an injection and CPR. Cow-

ans also had stated that Bass was already dead when he was first brought to the emergency room. At trial, he stated that he had not been answering the deposition questions truthfully because of his desire to protect Dr. Hoffman.

ville to obtain basic information on the circumstances of Bass' death. He was informed by unnamed prison personnel that when Bass was found lying on his cot he was unresponsive but had a weak pulse; that on the spot resuscitative efforts were unsuccessful; that Bass was taken to the emergency room, arriving there at 8:50; that further resuscitative efforts were unsuccessful; and that Bass then was pronounced dead by Dr. Hoffman.

Dr. Shalgos further testified that his external examination of Bass revealed electrode marks on the lower chest, the result of resuscitative efforts. An internal examination revealed clusters of minute hemorrhages in the uppermost part of the pharynx. According to Dr. Shalgos, Bass "very definitely" was alive at the time he incurred the hemorrhages because hemorrhages do not develop after death. Microscopic examination confirmed that the hemorrhages were "fresh," occurring very shortly before Bass died. Dr. Shalgos further concluded that the hemorrhages were caused by intubation, a resuscitative effort.

Dr. Shalgos also explained what was meant by the final conclusion of his supplemental report, which stated that "death is considered to be related to cardiorespiratory arrest of unknown cause occurring during sleep. . . ." The phrase "occurring during sleep" does not mean that Bass died in his sleep; rather, the phrase meant that the onset of the condition from which Bass died occurred while he was on the cot in his cell.

Dr. Shalgos further testified that the toxicology report was negative. And, although Dr. Hoffman's report on Bass prepared following his death noted vein track marks indicating drug use, Shalgos, who was specifically looking for such marks, found none. Shalgos found neither puncture wounds in the area of the heart that would have indicated injections were given in a resuscitative effort nor marks that would have indicated establishment of an intravenous line.

Finally, Dr. Shalgos testified that the estimated time of death in his report—8:00 A.M.—was based on information he had received. He also stated that it would have been impossible for him to determine the time of death within 40 to 45 minutes. The death certificate signed by the coroner stated that Bass was pronounced dead at 9:00 A.M.

Plaintiff's expert, Dr. Joseph Marek, an assistant professor at the Loyola University School of Medicine who teaches in the area of cardiology and is board-certified in cardiology and internal medicine, testified that a person who has a weak pulse is not in full cardiac arrest and has a greater chance of being successfully resuscitated. He further testified that dilated pupils do not indicate unresuscitability. In Dr. Marek's opinion, a twenty-seven-year-old person with no prior heart disease found unconscious but with a feeble pulse has an excellent chance of being resuscitated if advanced cardiac life support is provided within two minutes.

Dr. William Buckingham, Dr. Hoffman's expert witness, opined that Bass was dead when he was found in his cell at 8:35 A.M. He based this opinion on the evidence that Bass' pupils were fixed and dilated; that Bass was not breathing; and that Bass had no heartbeat. Buckingham disagreed with the position of the American Heart Association, found in its textbook of Advanced Cardiac Life Support, that the absence of pupillary response to light is not a reliable sign of brain death. He testified that the passage of urine and the presence of gastric contents in Bass' lungs indicated that Bass died in his sleep. Buckingham testified that a weak pulse is often the result of effective CPR, not evidence of life. In Buckingham's opinion, hemorrhages can occur after death as a result of intubation.

Stateville appears to have been plagued with recordkeeping problems. Such and Wallenstein testified that they had seen no records on the treatment of Bass on October 20, 1976. No medical records on the death of Bass, except for Dr. Hoffman's report on the events, could be found, even though numerous medical forms were to be filled out by hospital personnel. Cowans

testified that he submitted to Such a report on the events of October 20, 1976, but never again saw it. Meryl Wallter, a correctional officer, testified that a logbook was kept by the medical unit staff; the logbook would contain the names of inmates brought to the emergency room, the nature of the medical emergency, and the names of the staff members who administered treatment. Marlene Trenter, the custodian of medical records at Stateville, testified that she was given the emergency room logbook for the 3:00 P.M. to 11:00 P.M. and 11:00 P.M. to 7:00 A.M. shifts during the period from August 18, 1976 to January 13, 1978. The court ordered defendants to produce the emergency room logbook which contained entries for the 7:00 A.M. to 3:00 P.M. shift on October 20, 1976. The logbook for the day shift for the period from May 1, 1975 to March 27, 1977 then was "discovered" and produced at trial. Medical technician Revel Ivey testified that pages were missing from the logbook, specifically, those on which were recorded the emergency treatment, if any, rendered from October 15 through October 22, 1976. Ivey further testified that recorded in the logbook would be the names of the residents who were brought to the emergency room, and blood pressure, temperature, and pulse readings. If an inmate were dead on arrival at the emergency room, that fact would be recorded.

Gary Devers testified that a logbook was kept by correctional officers in Cellhouse B West. Devers further stated that he recorded in the logbook all actions taken by him with respect to Bass' complaints and requests for medical assistance on the 11:00 P.M. to 7:00 A.M. shift on October 19–20, 1976. Upon coming to work the next night and learning of Bass' death, Devers testified, he looked for but could not find the logbook.

Correctional officer Edwards testified that the logbook would remain in Cellhouse B West until filled completely and that if it

were missing, a full investigation would be conducted. David Brierton, Warden at Stateville, described how a cellhouse logbook is kept and what procedures would be followed if a logbook were reported missing or destroyed. Witnesses Brierton and Havard Harralson, the midnight shift commander on October 19–20, stated that they never were informed that the Cellhouse B West logbook for October 19–20 was missing. At trial, the Assistant Attorney General representing the defendants advised the court that the Cellhouse B West logbook for October 19–20 was not in the possession of the Department of Corrections.

## B.

The following evidence on the adequacy of the emergency medical care system at Stateville was adduced at trial. Cowans, the supervising medical technician of the emergency room, testified that only one medical technician and one nurse are on duty on the midnight shift. No doctor works this shift, but one is on call. In October, 1976, the inmate population at Stateville was approximately two thousand.

Cowans further testified that on numerous occasions prior to October, 1976, he had informed Such that Stateville employed insufficient efficient personnel to render effective emergency care. Cowans specifically had complained that medical technician Triola had failed to respond immediately when alerted by correctional officers to residents' medical needs.[4] On one occasion, Cowans testified, he had observed Triola's response to a correctional officer's heart attack. Cowans noticed that the patient could not breathe, examined his airway, and found that his dentures were obstructing it. The dentures were removed and breathing was reestablished. Triola told Cowans that he had not checked the patient's airway. Cowans also testified that in October, 1976, the medical techni-

---

4. Cowans explained the procedure at Stateville in 1976: when alerted to an inmate's medical complaint, the medical technician would visit the patient in the cellhouse and, if he thought treatment necessary, would issue a ticket that would allow the inmate to proceed to the hospital.

cians at Stateville were not qualified to administer injections or electric shock, treatments which must be rendered if CPR fails to resuscitate the cardiac arrest patient.

Dr. Hoffman testified that if CPR is unsuccessful, a physician must administer electric shock and injections as soon as possible. Dr. Hoffman stated that he was not qualified to administer injections.

Such testified that he was medical unit administrator at Stateville from October, 1974 to November, 1976. He was responsible for the budget, for hiring medical personnel, for instituting procedures that ensured the proper functioning of the medical unit, and for obtaining the necessary equipment and supplies for the medical unit. Such further testified that he assisted in preparing the Stateville General Hospital Manual, which contained the day-to-day procedures for providing medical care and defined the duties and responsibilities of medical personnel. The Manual also contained standing orders, which described the steps to be taken by security personnel in given medical situations; one addressed acute chest pain. The Manual contained no standard operating procedure for the treatment of cardiac arrest patients by physicians. One paragraph of the emergency treatment and first aid care manual addressed standard operating procedures for medical technicians in cardiac arrest cases. Such acknowledged that there were limitations on the medical services that medical technicians could render in cardiac arrest cases in the absence of orders from a physician.

Such also explained the sick call procedure. Medical technicians were responsible for screening residents' requests for medical assistance, notifying physicians of medical problems, and ensuring that proper medication was delivered. Transfer tickets permitting the residents to proceed to the hospital for medical treatment were issued by medical technicians. If a medical technician refused to issue a ticket, the resident could appeal the decision to the shift commander who then was required to order that the resident be brought to the hospital.

Such testified that he could not recall a specific case in which a resident's request for medical assistance was ignored. Nor was he aware of any shortcomings in the sick call procedure in 1976. He acknowledged, however, that he had written a memorandum to Wallenstein in which he identified approximately fifty residents who had requested medical assistance. Wallenstein's response was that Such should issue tickets to the residents allowing them to obtain treatment.

Arthur Wallenstein, Assistant Warden for Program Services at Stateville, including the Medical Program, testified that the purpose of Administrative Regulation 836, which required, in part, the establishment and implementation of a written emergency medical plan, was to document that emergency services were available. The emergency section of the hospital manual and the job descriptions of medical unit personnel were prepared to comply with A.R. 836.

Wallenstein testified that he was aware of the importance of prompt response to medical emergencies and agreed that a resident could have a heart attack or other serious medical emergency during the midnight shift. Wallenstein confirmed that the medical needs of the Stateville population in October, 1976 (2,000 to 2,600 residents) were served during the midnight shift by one medical technician; no physician was on duty at the institution during this shift.

Wallenstein was familiar with an evaluation (authorship unknown) of the Stateville medical unit that indicated a problem with the Stateville sick call procedure. He learned that residents had complained of difficulties in "getting to sick call." Wallenstein acknowledged the memorandum from Such; he testified only that he was not aware of any refusals to render medical assistance to residents in the "twenty-four hour period" preceding October 20, 1976.

Cecil Patmon, Medical Services Administrator for the Department of Corrections in

1976, testified that he authored the administrative regulations for the delivery of health care services in state institutions. Patmon acknowledged that the only relevant standard operating procedure then contained in the Stateville hospital general manual was one addressing acute chest pain. It read:

> [T]ake vitals, give $O_2$, get EKG, call M.D. and if none transport to local hospital.

The manual contained no other standard operating procedures for emergency cardiac care; Patmon further testified that he was unaware of any standard operating procedures for emergency cardiac care by medical technicians.

Plaintiff's expert, Dr. Marek, reviewed the Stateville general manual; other than the standing orders on acute chest pain, he found that the manual contained nothing on the treatment of cardiac arrest. He also reviewed the first aid manual, directed to medical technicians and nurses, and concluded it contained insufficient standard operating procedures for cardiac arrest cases. Marek testified that a physician responsible for the medical treatment of a confined population of 2,000 persons must be able to render advanced cardiac life support. Marek stressed the need for prompt response to a cardiac arrest. If a medical technician is not qualified to administer injections when necessary and the physician, who should be qualified to do so, fails to respond promptly, there is little likelihood of resuscitation. Marek testified that the equipment necessary to render advanced cardiac life support is useless without personnel trained to use it; emergency medical personnel must be trained to administer advanced cardiac life support either under the direction of a physician or pursuant to written standing orders. In Marek's opinion, Stateville medical personnel could not provide advanced cardiac life support.

## II.

We turn first to Dr. Hoffman's challenges to the jury's finding of liability. Dr. Hoffman initially contends that he was entitled to a directed verdict or to judgment notwithstanding the verdict because the evidence adduced at trial failed to establish the requisite causal connection between his conduct and Bass' death.

A "demanding standard" governs the granting of a motion for judgment notwithstanding the verdict. *McKinley v. Trattles*, 732 F.2d 1320, 1324 (7th Cir.1984).

> The motion should be denied where the evidence, along with all inferences to be reasonably drawn therefrom, when viewed in the light most favorable to the party opposing such motion, is such that [people] in a fair and impartial exercise of their judgment may reach different conclusions.

*Id.* at 1323–24 (quoting *Kolb v. Chrysler Corp.*, 661 F.2d 1137, 1140 (7th Cir.1981)). *See also Estate of Davis v. Johnson*, 745 F.2d 1066, 1070 (7th Cir.1984). In short, the test is whether the evidence, viewed in the light most favorable to the prevailing party, is sufficient to support the verdict. *Syvock v. Milwaukee Boiler Manufacturing Co.*, 665 F.2d 149, 153 (7th Cir.1981).

Dr. Hoffman correctly points out that the plaintiff in a section 1983 action must prove a causal connection between his injury and the defendant's unconstitutional conduct. *See Benson v. Cady*, 761 F.2d 335, 339 (7th Cir.1985); *Parrett v. City of Connersville, Ind.*, 737 F.2d 690, 695 (7th Cir.1984), *cert. dismissed,* —— U.S. ——, 105 S.Ct. 828, 83 L.Ed.2d 820 (1985). Here, plaintiff was required to establish a causal connection between Dr. Hoffman's failure to respond to the emergency, *i.e.*, his "deliberate indifference" to Bass' serious medical needs, *Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), and Bass' death. Dr. Hoffman contends that the evidence demonstrated that Bass was already dead when found at 8:35 A.M. and could not have been resuscitated by him no matter how quickly he responded or what resuscitative measures were taken.

■ Viewing the evidence in the light most favorable to plaintiff, we conclude that a jury, in a fair and impartial exercise of judgment, could have found otherwise. True, the undisputed evidence established

that when Bass was discovered in his cell at 8:35 A.M. he was unconscious. But sufficient evidence supports the conclusion that he was not dead. Correctional officer Shifflet testified that medical technician Triola indicated that Bass had a slight pulse; correctional officer Edwards heard Triola say there might be a heartbeat.[5] And, assuming the jury accepted the testimony that Bass' pupils were fixed and dilated,[6] plaintiff's expert testified that this does not indicate brain death or unresuscitability. Additionally, Dr. Shalgos testified that Bass "very definitely" was alive when he incurred the hemorrhages from intubation (which, the evidence shows, occurred in the emergency room) because hemorrhages do not develop after death.[7] Finally, Cowans testified that he would not have continued his efforts to resuscitate Bass for forty-five minutes if Bass were obviously dead. In sum, there was sufficient evidence in the record to establish that Bass was still alive when he was found in his cell at 8:35 A.M. and when he was first brought to the emergency room.

■ We also conclude there was sufficient evidence to support the conclusion that a causal connection existed between Dr. Hoffman's conduct and Bass' death. The evidence established that Dr. Hoffman intentionally failed to respond immediately to the initial request that he come to the emergency room. Indeed, it was only

when he was ordered by Such to respond that he did so. The testimony established that Dr. Hoffman entered the emergency room ten to fifteen minutes after he had first been notified of the emergency. All physicians who testified agreed that an immediate response to a cardiac arrest case is crucial—seconds count.

Dr. Hoffman argues that the only evidence that Bass could have been resuscitated came from plaintiff's expert, Dr. Marek. Dr. Marek testified that, in his opinion, a twenty-seven-year-old person with no prior heart disease found unconscious but with a feeble pulse has an excellent chance of being resuscitated if advanced cardiac life support is provided within two minutes. Marek found his opinion supported by a study, the data of which established that if basic life support is provided within five minutes and advanced cardiac life support within eight to ten minutes, the patient's chance for survival would be 10–30%. Finally, Marek testified that a person with a feeble pulse is not yet in full cardiac arrest; the chance of successful resuscitation in such a case is greatly enhanced.

■ Dr. Hoffman challenges Marek's opinion as (1) unsupported by the evidence; (2) directly contradicted by Dr. Buckingham, his expert; and (3) too speculative to be of probative value.

We reject Dr. Hoffman's contention that Marek's opinion must be disregarded be-

---

5. True, Triola denied making these statements, and testified that Bass had neither a pulse nor a heartbeat. The jury obviously chose to believe Edwards and Shifflet.

6. Correctional officer Edwards so testified. When asked by plaintiff's counsel how he knew Bass' pupils were fixed and dilated Edwards responded, "[j]ust eyeballed it myself." Edwards did not test Bass' pupillary response either by interrupting the light source or by flashing artificial light in Bass' eyes. Dr. Buckingham testified that only by changing the light intensity reaching the pupils can one test their reactiveness.

7. Dr. Hoffman points out that his expert, Dr. Buckingham, testified that hemorrhages can and do occur after death. Dr. Hoffman adds that Shalgos' testimony was "severely impeached" by his autopsy report in which he estimated the time of death as 8:00 A.M. and

stated that Bass died in his sleep. To the extent Dr. Hoffman asks us to judge the credibility of the witnesses or to resolve conflicts in the testimony, he misconceives our role. We are to view the evidence in the light most favorable to the prevailing party, a standard that respects the jury's credibility determinations, its resolution of conflicts, and the weight it has given the evidence. We will not reweigh that evidence here. We note, however, that Dr. Hoffman disregards Shalgos' explanation of his autopsy report. Shalgos testified that the estimated time of death was based upon information he received from Stateville personnel; that he could not accurately determine the exact time of death; and that the phrase "occurring during sleep" in the report meant that the *onset* of the condition from which Bass died occurred while he was on the cot in his cell.

cause the assumption upon which it is based—that Bass had a pulse when discovered—is not supported by the evidence. As we previously noted, sufficient evidence supports the conclusion that Bass was alive when found in his cell. To sustain Dr. Hoffman's argument we would have to substitute our judgment for the jury's determination that Edwards and Shifflet, not Triola, presented the most credible testimony on the existence of a pulse. For the same reason, Marek's testimony is not vulnerable merely because Dr. Hoffman's expert testified that, in his opinion, Bass was dead when found in his cell and could not possibly have been resuscitated. We further note that Buckingham's opinion was based upon the testimony that Bass' pupils were fixed and dilated, and that he had no pulse or heartbeat, evidence the jury need not have accepted.

Finally, Dr. Hoffman argues that Marek's testimony established that even if Bass were provided with advanced cardiac life support as soon as he arrived in the emergency room, his chance of survival was miniscule.

The scenario most favorable to Dr. Hoffman is as follows: Bass was found in his cell at 8:35 A.M.; and Bass did not arrive in the emergency room until 8:50, fifteen minutes later. Extrapolating from Marek's testimony that one provided with advanced cardiac life support within eight to ten minutes has a 10–30% chance of survival, Bass' chance of survival was less than 10% and probably closer to zero.

But viewing the evidence in the light most favorable to plaintiff, as we must, the jury could have found from the evidence, and apparently did, that Bass was discovered in his cell at 8:35 A.M. with a feeble pulse and therefore not in full cardiac arrest; that Triola immediately began CPR, thereby providing Bass with some basic life support; and that Bass arrived in the emergency room at 8:45 A.M., ten minutes later. According to Marek's testimony, if advanced cardiac life support then had been initiated, Bass would have had a 10–30% chance of survival. Indeed, according to

Dr. Shalgos, Bass was alive when he was intubated in the emergency room. The jury clearly could have found that had Dr. Hoffman responded immediately Bass may have survived. Contrary to Dr. Hoffman's implicit contention, the evidence need not have established that if Bass had been given advanced cardiac life support immediately upon his arrival in the emergency room his chance for survival would have been 100%. The law does not require and medicine cannot provide such exactitude. We find sufficient evidence to support the jury's finding of a direct causal relationship between Dr. Hoffman's deliberate indifference and Bass' death.

Wallenstein and Such contend that plaintiff failed to establish that institutional procedures, personnel, and facilities were inadequate to ensure the delivery of emergency medical care; indeed, they argue, the evidence establishes that, as a matter of law, they were not guilty of deliberate indifference.

Viewing the evidence in the light most favorable to plaintiff, the jury could have found gross deficiencies in the sick call procedure, staffing, and personnel. There was evidence to establish that the sick call procedure, the efficacy of which depended upon a prompt response to complaints, indeed *a* response, by medical technicians, was insufficient to ensure inmates' access to medical care.

Both Wallenstein and Such acknowledged a memorandum, written by Such and directed to Wallenstein, in which Such identified approximately fifty residents who had requested but not received medical assistance. Wallenstein directed Such to issue tickets enabling the residents to obtain treatment. Wallenstein further acknowledged familiarity with an evaluation of the Stateville medical unit that pointed out deficiencies in the ability of the sick call procedure to ensure residents' access to medical care. Wallenstein also admitted that he had received complaints from residents con-

cerning access to medical treatment.[8]  Additionally, Cowans informed Such that Triola had failed to respond when alerted by guards to residents' requests for medical assistance.  A jury fairly could conclude from this evidence that serious deficiencies existed in the sick call procedure at Stateville and that Wallenstein and Such were aware of these deficiencies.

The jury also could have found that the sick call procedure failed to ensure Bass' access to medical treatment.  Devers testified[9] that the midnight-shift medical technician's response to Bass' first request for medical assistance was to send two pills; and to Bass' second request, the medical technician replied that the pills should work.  Devers further testified that a day-shift medical technician, Triola, was informed of Bass' requests at 6:35 A.M.  The evidence showed that the request was ignored.[10]

The jury also could have concluded that medical unit personnel were not qualified to treat cardiac arrest cases.  Although there seems to be no dispute that the medical unit contained the equipment necessary to render advanced cardiac life support, the evidence, viewed most favorably to plaintiff, supported the conclusion that medical personnel were not qualified to use it.  Dr. Hoffman, the physician responsible for the medical treatment of approximately 2,000 persons on October 20, 1976, acknowledged the necessity of electric shock treatment and injections if CPR fails to resuscitate a cardiac arrest patient.  He then candidly admitted that he was not qualified to administer injections.  Medical technician Cowans testified that the medical technicians employed at Stateville in October, 1976 were not permitted to administer electric shock treatment or injections to a cardiac arrest patient in the absence of orders from a physician, a limitation acknowledged by Such.  The plight of a cardiac arrest patient at Stateville was apparent: if CPR was unsuccessful and a physician could not be reached, there was little chance of successful resuscitation by the medical technicians; and, even if a physician could be reached, he also was limited in the treatment he could provide.  Finally, there was evidence from which it could be inferred that at least one medical technician, Triola, was not competent to render even basic treatment in such emergency cases.  Cowans brought this to Such's attention and frequently expressed concern that the medical unit was staffed by insuf-

8.  According to Wallenstein, these complaints indicate that prison officials are accessible to inmates for the purpose of pursuing grievances.

9.  Defendants claim that Devers was a "surprise witness" and that the district court therefore committed reversible error in permitting him to testify.  During the discovery process, plaintiff requested records identifying the officers on duty in Cellhouse B West on October 19 and 20, but was informed that no such records existed.  Plaintiff's witness list advised defendants that all officers on duty on October 19 and 20 could be potential witnesses.  At trial, defendants objected when Devers was called to testify on the ground that his name was not on the witness list.  Counsel for defendants further stated that because no records existed, he had no idea who was on duty that night.  We find this incredulous in light of shift commander Harralson's testimony that he maintained shift assignment records which contained the names of employees working his shift and kept them until he left Stateville in October, 1980.  At the time of plaintiff's request in April, 1980, then, defendants' witness had records containing the names of officers on duty in Cellhouse B West on October 19 and 20.  Under the circumstances Devers can hardly be deemed a surprise witness.  Perhaps this also explains why defendants failed to complain of the lack of specificity in plaintiff's witness list, a failure the district court deemed fatal to defendants' contention at trial that Devers should not be permitted to testify.  We find no reversible error.

10.  Wallenstein and Such contend that Devers' testimony established the existence of a medical emergency policy which Devers and the medical technicians failed to follow.  They suggest that the medical technicians and Devers' failure to follow established procedures on one isolated occasion cannot be the basis for their liability.  That a procedure existed is not disputed,  The efficacy of the procedure was disputed.  Defendants' argument ignores the evidence that sick call procedures were not followed on previous occasions, resulting in denial or delay of access to medical care.

ficient personnel qualified to render emergency medical care.[11]

Contrary to defendants' assertion, the jury could have concluded that there were "such systemic and gross deficiencies" in staffing, the quality of personnel, and sick call procedures that the inmate population, including Johnny Lee Bass, was effectively denied access to adequate medical care. *Wellman v. Faulkner*, 715 F.2d 269, 272 (7th Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 3587, 82 L.Ed.2d 885 (1984).

In anticipation of the above-stated conclusion, Such and Wallenstein have advanced several "possible factual scenarios" which negate their liability. First, they argue that because the evidence suggested that Bass was dead when first discovered in his cell, whether the procedures were adequate and the personnel competent were irrelevant. Two short responses are in order. We have concluded that the jury could have found that Bass was alive when first discovered in his cell and when transported to the emergency room. And, even if Bass were dead when discovered in his cell, the inadequacy of the sick call procedure which delayed his access to medical care during the night would provide a basis for a finding of liability. The second scenario, which has Bass unsuccessfully crying out for help during the night, does not, according to defendants, implicate them; they cannot be held personally liable for their employees' failure to follow sick call procedures guaranteeing inmates' access to medical care. As we previously noted, there was sufficient evidence to support a finding that the sick call procedure failed to ensure prompt access to medical care and that Such and Wallenstein had been so informed. They are personally responsible for the failure to implement an emergency plan that guaranteed access to medical care. The third scenario is that Bass was alive when found and was transported to the emergency room in accordance with adequate procedures and treated by appropriately trained medical personnel. Thus, there was no basis for liability. The jury found otherwise on the basis of evidence we find sufficient to support that finding.

Such and Wallenstein contend that the district court erred in refusing to instruct the jury to consider their good faith immunity defense under *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). In *Harlow,* the Supreme Court held that

> government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.... If the law was clearly established, the immunity defense ordinarily should fail....

*Id.* at 818–19, 102 S.Ct. at 2738–39. The determination whether the law was clearly established at the time of the incident giving rise to the section 1983 action is for the court, not the jury.

In a recent eighth amendment case brought by the administrator of the estate of the decedent, an inmate at Stateville at the time of his death in December, 1975, we found that although *Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), the leading case on deliberate indifference to inmates' serious medical needs, was not yet decided when decedent died, the deliberate indifference or willful neglect standard nevertheless was clearly established. *Joseph v. Brierton,* 739 F.2d 1244, 1249–50 (7th Cir.1984) (citing *Thomas v. Pate,* 493 F.2d 151, 158 (7th Cir.), *cert. denied sub nom. Thomas v. Cannon,* 419 U.S. 879, 95 S.Ct. 143, 42 L.Ed.2d 119 (1974)). We held that defendants therefore were not entitled to immunity. We so hold in this case.

Finally, we reject defendants' contention that they are entitled to a new trial because the jury's findings of liability are against the clear weight of the evidence.

---

11. The evidence also established that one medical technician and one nurse were responsible for the emergency medical care of approximately 2,000 inmates on the midnight shift. The difficulties in handling simultaneous medical emergencies is apparent.

Our function as an appellate court is not to decide as an original matter whether we think the jury's verdict is against the clear weight of the evidence. The district court's denial of a motion for a new trial is to be reviewed under an abuse of discretion standard. *Robison v. Lescrenier,* 721 F.2d 1101, 1104 (7th Cir.1983). We find no abuse of discretion here.

### III.

Although we affirm the district court's denial of defendants' motions for judgment notwithstanding the verdict or for a new trial on the issue of liability, we find that the court's instructions to the jury on the damages to be assessed constitute reversible error.

Mary Lewis, Bass' natural mother, was appointed administrator of his estate by the probate court. She brought suit under section 1983 on behalf of the estate to recover damages for injuries suffered by Bass as a result of the deprivation of his constitutional rights, specifically "pain and death." The rights that were alleged to have been violated here were Bass' eighth amendment right to be free from cruel and unusual punishment and his fourteenth amendment right not to be deprived of his life without due process of law. Lewis did not assert an independent statutorily-created cause of action for Bass' wrongful death,[12] nor did she claim that her constitutional rights or those of Bass' children were violated by defendants. *Cf. Bell v. City of Milwaukee,* 746 F.2d 1205, 1242 (7th Cir.1984) (father and siblings of decedent claim deprivation of their fourteenth amendment liberty interest in the continued society and companionship of decedent).

Plaintiff's proposed damages instruction, although not specifying the elements of damages claimed to be recoverable, stated in pertinent part that she "claims damages for the death of the decedent, Johnny Lee Bass, alleged to have been suffered or sustained by the decedent as a result of the deprivation" of his constitutional rights. Over defendants' objections, the jury was instructed that Lewis represented Bass' three children; that Bass' children were the real parties in interest; and that it was to assess damages in their favor if it found defendants liable. The damages instruction given tracked the Illinois Pattern Jury Instruction on the measure of damages recoverable by the beneficiaries in a wrongful death action.[13] The jury was further

---

**12.** After the presentation of the evidence but before the jury was charged, plaintiff renewed her motion for leave to file a third amended complaint, first made during the presentation of her case. Claiming that Dr. Hoffman had "defend[ed] this case on the basis of negligence" and invoking Rule 15(b) of the Federal Rules of Civil Procedure which permits amendments to conform to the proof, plaintiff sought to add a pendent state claim against Dr. Hoffman for negligently causing Bass' death. This amended complaint alleged for the first time that Bass was survived by three children who had suffered pecuniary loss by reason of his death. The district court refused to permit amendment of the complaint to raise this wrongful death claim on behalf of Bass' children. The court found no indication that Dr. Hoffman perceived this to be a negligence case and stressed that the one-count second amended complaint clearly raised a claim only under section 1983. The court further stated that defendant did not have fair notice that the issue was being raised. Nevertheless, the district court proceeded to instruct the jury that if it found defendants liable, it should assess damages for losses sustained by Bass' children as a result of his death.

**13.** The jury was instructed as follows:
If you decide for the plaintiff on the question of liability, you must then fix the amount of money which will reasonably and fairly compensate the children of the decedent for the pecuniary loss proved by the evidence to have resulted to them from the death of the decedent.

Where the decedent leaves children, the law recognizes a presumption that they have sustained substantial pecuniary loss by reason of the death.

In determining pecuniary loss and the weight to be given to the presumption of pecuniary loss, you may consider what benefits of pecuniary value, including money, goods and services the decedent might reasonably have been expected to contribute to the children had the decedent lived, and the reasonable value of the decedent's society and companionship the decedent's children have been deprived of and are reasonably certain to be deprived of in the future, bearing in mind the following factors concerning the decedent:

1. What he customarily contributed in the past;
2. What he earned or what he was likely to earn in the future;

instructed that it could award damages for any pain and suffering experienced by Bass before his death.[14] It is impossible to tell from the record and transcript of the instruction hearing whence the damages instructions given by the court came. The instructions were not included plaintiff's proposed instructions; however, they were among a set of instructions identified as "filed jury instructions given." It appears that the instruction may have been composed by or at the direction of the district judge, who stated at the hearing that according to the only testimony before him the administrator purported to represent Bass' children.

Defendants take issue with damages instructions that did not track the theory of recovery set forth in the second amended complaint. Specifically, they argue that the jury should not have been instructed to assess damages in favor of Bass' children under the state wrongful death statute when suit was brought on behalf of the estate to recover damages for injuries suffered by Bass.

■ The issue presented requires this court to consider once again the interplay between federal and state law in section 1983 actions. Section 1988 establishes a three-step process for the selection of the appropriate substantive law in civil rights actions. First, it is to be determined whether federal civil rights law is deficient in that it fails to furnish a particular rule; if it is deficient, the most closely analogous state law may fill the vacuum only if it is

consistent with the meaning and purpose of constitutional and federal statutory law. If state law is inconsistent, it must be disregarded in favor of the federal common law. *See Robertson v. Wegmann*, 436 U.S. 584, 587–90, 98 S.Ct. 1991, 1993–95, 56 L.Ed.2d 554 (1980); *Bell*, 746 F.2d at 1234.

■ Section 1983 is silent on the question whether a decedent's constitutional claims survive his death and on the issue of the appropriate measure of damages. Therefore, the court is to look to the most closely analogous state law to determine survivability and the appropriate measure of damages. The court may not, however, mold the constitutional claim to fit within the parameters of state law. The first step is to characterize properly the section 1983 claim asserted.

■ An examination of Lewis' second amended complaint reveals that she, as administrator of her son's estate, was seeking redress for the violation of his constitutional rights. The rights alleged to have been violated were Bass' eighth amendment right to freedom from cruel and unusual punishment and his fourteenth amendment right not to be deprived of life without due process of law. The injuries alleged to have been sustained by Bass were "pain and death" for which Lewis sought compensatory and punitive damages. Lewis was asserting Bass' cause of action; she did not sue on her own behalf or on behalf of Bass' surviving widow and dependent children.[15]

---

3. What he spent for customary personal expenses;
4. What instruction, moral training, and superintendence of education he might reasonably have been expected to give his children had he lived;
5. His age;
6. His health;
7. His habits of industry, sobriety, and thrift;
8. His occupation.

14. Under Illinois law, the estate may recover for conscious pain and suffering experienced by the decedent prior to death. The damage award recovered under the Wrongful Death Act for losses sustained by the beneficiaries as a result of the decedent's death is not to be treated as

part of the estate. From the general verdict in this case it is impossible to tell how the jury apportioned the damages between the estate and the beneficiaries.

15. Defendants argue that the second amended complaint was "fatally defective" because it failed to allege the existence of next of kin entitled to recover under the Wrongful Death Act and the pecuniary losses they suffered as a result of Bass' death, and that they therefore were entitled to judgment in their favor. Illinois law does indeed require an allegation of the survivorship of a beneficiary within the category of persons entitled to recover under the Act. *Gustafson v. Consumers Sales Agency, Inc.*, 414 Ill. 235, 110 N.E.2d 865 (1953). In a wrong-

Illinois law provides for the survival of a decedent's claim for pre-death physical injuries, including conscious pain and suffering. Suit to recover damages for such injuries is to be brought on behalf of the estate by the administrator. Ill.Rev. Stat. ch. 110½, § 27–6; *Howe v. Clark Equipment Co.*, 104 Ill.App.3d 45, 59 Ill. Dec. 835, 432 N.E.2d 621 (4th Dist.1982). Illinois law also provides for the survival, in the form of a wrongful death action, Ill.Rev.Stat. ch. 70, § 1 *et seq.*, of a decedent's claim that he was harmed by the defendant's wrongful act, *i.e.*, that defendant owed and breached a duty to decedent and that the breach was the proximate cause of decedent's injuries. The cause of action under the Illinois Wrongful Death Act is based upon the wrongful act, not decedent's death. If the decedent had no cause of action at the time of injury, the personal representative has none under the Act. Although a suit under the wrongful death statute is based upon the harm suffered by decedent as a result of the defendant's wrongful act, recovery may not be had on the decedent's behalf for the loss of life itself. The purpose of the Act is to provide designated survivors with the benefits they would have received from decedent had he lived. The damages recoverable under the Act are the survivors' pecuniary losses.

Under the Illinois statutory scheme, then, the estate may recover for Bass' conscious pain and suffering. But Illinois law, in denying recovery on behalf of the estate for loss of life, effectively calls for abatement of Bass' constitutional claim that defendants deprived him of his fourteenth amendment right to life through deliberate indifference to his serious medical needs. *See O'Connor v. Several Unknown Correctional Officers*, 523 F.Supp. 1345, 1349 (E.D.Va.1981) (Virginia wrongful death statute which compensates only for pecuniary losses of survivors effectively abates claims for violations of decedent's eighth and fourteenth amendment rights).

The proper approach at this point is not to transform the section 1983 action on behalf of Bass into a wrongful death

---

ful death action, the amount recovered shall be for the exclusive benefit of the surviving spouse and next of kin. The phrase "next of kin" has been defined as "blood relatives ... in existence at the time of the death of the deceased who would take his personal property in case he died intestate." *Id.* at 245, 110 N.E.2d 865 (citing *Wilcox v. Bierd*, 330 Ill. 571, 162 N.E. 170 (1928)). Distribution of the judgment follows the statute of descent. *McGraw v. Oelig*, 309 Ill.App. 628, 33 N.E.2d 758 (1941). According to that statute, Ill.Rev.Stat. ch. 110½, § 2–1, the intestate real and personal property of a resident decedent shall be distributed first to the surviving spouse and descendants of the decedent. Only if no spouse or descendants survive decedent will the decedent's parents and siblings inherit. Under Illinois law, it seems apparent that the second amended complaint did not effectively assert a right to recovery under the Wrongful Death Act. The complaint contains nothing that can be construed as an allegation of the survivorship of a beneficiary entitled to recover under the Act. Because Bass was survived by a spouse, Mary Bass (who was entitled to recover under the Act but was never considered by the court in its instructions to the jury) and three children, Lewis apparently would not have been entitled to recover under the Act. Defendants correctly contend that no claim was asserted on behalf of the survivors.

But to the extent defendants argue that judgment therefore should have been rendered in their favor, they miss the mark. This action was brought pursuant to section 1983, and the complaint was clearly adequate to state a claim for the deprivation of Bass' constitutional rights.

Lewis, on the other hand, now asks this court to transform this suit into one on behalf of Bass' children by waving the magic wand of Rule 15(b) of the Federal Rules of Civil Procedure. Because defendants did not object to her testimony on the existence of Bass' three children and the extent of the support provided them by Bass in the years preceding his death, the issue of their damages, she contends, was tried by the implied consent of defendants and the complaint was automatically amended to conform to this proof. Plaintiff's proposed damages instruction suggests that she herself did not believe that she was trying the issue of the children's damages. That instruction paralleled the second amended complaint's prayer for damages for injuries suffered by Bass. Nor do we believe that plaintiff's testimony represents trial of the issue of the children's damages. The testimony was clearly relevant to the issue of Bass' damages, specifically, the value to be placed on the loss of his life. For this reason, defendants' failure to object cannot be deemed indicative of their implied consent to the trial of the issue of the children's damages.

action on behalf of those who survived him, but to determine whether state law is inconsistent with the compensatory and deterrent policies underlying section 1983. This court recently performed this analysis in *Bell* with results that pertain here. We held that where the constitutional deprivation sought to be remedied has caused death, state law that precludes recovery on behalf of the victim's estate for the loss of life is inconsistent with the deterrent policy of section 1983. *Bell,* 746 F.2d at 1240; *see also Guyton v. Phillips,* 532 F.Supp. 1154, 1167–68 (N.D.Cal.1981). Nor can restrictive state law preclude the estate's recovery of punitive damages in a case in which the showing of "recklessness or callous indifference" required by *Smith v. Wade,* 461 U.S. 30, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983), has been made.[16] "To disallow punitive damages in Section 1983 actions solely on the basis of restrictive state tort law would seriously hamper the deterrence effect of Section 1983." *Bell,* 746 F.2d at 1241 (citing *McFadden v. Sanchez,* 710 F.2d 907 (2d Cir.1983)). Such restrictive state laws must give way to federal common law rules that permit recovery. In sum, in a section 1983 action, the estate may recover damages for loss of life, conscious pain and suffering experienced by the decedent prior to death, and punitive damages in a case in which the standard of *Smith v. Wade* has been satisfied.

■ In this case, the district court effectively characterized the action as one on behalf of Bass' surviving children. It was not. Suit was brought on behalf of the estate to recover for injuries suffered by Bass. For this reason, it was error to instruct the jury to assess as damages the pecuniary losses suffered by Bass' children as a result of his death. We have attempted to provide guidance as to the elements

of damages that are recoverable in a case like the one before us. We now remand for a new trial on damages in accordance with the principles set forth herein.

In conclusion, we affirm the district court's denial of defendants' motions for judgment notwithstanding the verdict or for a new trial on the issue of liability, but vacate the judgment and remand for a new trial on damages. Circuit rule 18 shall not apply.

---

16. Illinois state law does not permit the recovery of punitive damages in a wrongful death action. *Mattyasovszky v. West Towns Bus Co.,* 61 Ill.2d 31, 330 N.E.2d 509 (1975). Apparently, punitive damages are not recoverable under the Survival Act either. *Id.* But see *Howe v. Clark Equipment Co.,* 104 Ill.App.3d 45, 59 Ill.Dec. 835, 432 N.E.2d 621 (4th Dist.1982). This court

has of course been bound by this state law in diversity actions. *See, e.g., In re Air Crash Disaster Near Chicago, Ill.,* 644 F.2d 594 (7th Cir.), *cert. denied,* 454 U.S. 878, 102 S.Ct. 358, 70 L.Ed.2d 187 (1981). As we have made clear, however, state law is not automatically applied in section 1983 actions. *Bell,* 746 F.2d at 1234.