In the

# United States Court of Appeals
## For the Seventh Circuit

No. 17-1603

ALFREDO MIRANDA, Administrator of Estate of Lyvita Gomes,

*Plaintiff-Appellant*,

*v.*

COUNTY OF LAKE, *et al.*,

*Defendants-Appellees*.

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 12 C 4439 — **Sharon Johnson Coleman**, *Judge*.

ARGUED DECEMBER 6, 2017 — DECIDED AUGUST 10, 2018

Before WOOD, *Chief Judge*, and EASTERBROOK and HAMILTON, *Circuit Judges*.

WOOD, *Chief Judge*. In the fall of 2011, Lyvita Gomes failed to show up for jury duty. This minor infraction triggered a series of events that led to her untimely death in the early days of 2012. She wound up in the county jail, where she refused to eat and drink. The medical providers who worked at the Jail did little other than monitoring as she wasted away in her

cell. By the time she was sent to the hospital, it was too late to save her.

Alfredo Miranda, the administrator of Gomes's estate, brought an action under 42 U.S.C. § 1983 and assorted state-law theories against Lake County, the Jail officials (the "County defendants"), and Correct Care Solutions (CCS, the Jail's contract medical provider) and its employees (the "medical defendants"). The district court dismissed the County defendants at summary judgment. The medical defendants proceeded to trial, but halfway through the proceeding the court granted judgment as a matter of law under Federal Rule of Civil Procedure 50(a) for them on some claims. The Estate prevailed to a modest degree on another claim, and part of the case resulted in a mistrial. Our principal ruling in response to the Estate's appeal is that the Rule 50(a) judgment was premature, and so further proceedings are necessary.

# I

## A

On October 12, 2011, an officer arrested Gomes, a 52-year-old Indian national, for failing to appear for jury duty. (In hindsight, this was the County's first misstep: as a non-citizen, Gomes was categorically ineligible to serve as a juror. 705 ILCS 305/2(a)(4).) Gomes pulled away from the officer as he attempted to arrest her. That action earned her a second charge of resisting arrest. The officers took Gomes to Lake County Jail, where she made statements that landed her on suicide watch the next day. But she did not stay at the Jail long. On October 14, Gomes was transferred to the custody of the federal Immigration and Customs Enforcement (ICE) service, which released her within a few days.

Roughly two months later, on December 14, after failing to appear in court on the resisting-arrest charge, Gomes found herself back in the Lake County Jail. Though officials initially placed her in the general population, it quickly became apparent that her physical and mental health were deteriorating, and so she was moved.

On December 16, CCS's Director of Mental Health, Jennifer Bibbiano (a social worker), performed a mental health evaluation on Gomes. Bibbiano documented that Gomes had ingested no food or water since arriving at the Jail two days earlier. As a result, Gomes was transferred the next day to the Jail's medical pod for closer monitoring. On December 18, staff placed Gomes on suicide watch and the hunger strike protocol. At that point, after she had gone four days without food or water, staff weighed her for the first time and recorded a weight of 146 pounds. Over the next ten days, this number plummeted; by December 28, Gomes weighed only 128 pounds.

During this period, social workers and physicians continued to assess Gomes daily. Defendant Dr. Rozel Elazegui, an internist, saw Gomes on December 22 and 27. In several progress notes, the CCS staff reported various symptoms of dehydration, such as skin tenting. Gomes's refusal to eat or drink and her unresponsiveness often prevented the medical staff from recording her vital signs and collecting any blood or urine samples. For most of this time, Gomes lay in bed and refused to speak.

As Gomes's physical condition worsened, concerns about her mental state grew. When Gomes appeared in court on December 20, the judge ordered a mental fitness examination. On December 22, Gomes was identified as needing an urgent

psychiatric visit. That prompted a visit two days later from psychiatrist Hargurmukh Singh, who first met Gomes then and diagnosed her with a "psychotic disorder not otherwise specified." He prescribed no medication. After seeing Gomes again on December 27, Dr. Singh concluded that her psychosis rendered her unable to understand the risks of not eating and unable to participate in her treatment plan. But his only advice to Dr. Elazegui, who wanted to perform an involuntary blood draw for monitoring purposes, was that Elazegui could do so if push came to shove.

Around this time the officials in charge of Lake County Jail entered the picture. On December 26, Wayne Hunter, the Jail's acting chief, was first notified by email that Gomes was in the Jail and was refusing medical treatment and tests. Hunter received assurances that CCS staff were monitoring Gomes's condition and that they would provide him with any updates. Two days later, Hunter personally went down to Gomes's cell in a futile attempt to persuade her to eat. On December 27, Scott Fitch, the liaison between the correctional and medical staff, learned about Gomes. He too asked for updates. Fitch called Gomes's public defender, entreating her to visit and encourage her client to eat. Sheriff Mark Curran did not hear about Gomes until December 29, the day she left the Jail. That same day, Jail officials went to court to get Gomes formally released from custody.

Also on December 29, Dr. Young Kim, another CCS internist, returned to work from a vacation. Dr. Kim was surprised to learn that Gomes had remained in the Jail while continuing to refuse all food and drink. (A few stray comments in Gomes's medical records suggest that she may have rubbed water on her body and perhaps taken a few sips of water from

her sink. But the record as a whole implies little to no water intake.) Dr. Kim immediately called an ambulance to take Gomes to the hospital for evaluation and treatment of her dehydration and psychosis. Unfortunately, this intervention came too late. On January 3, 2012, five days after arriving at the hospital, Gomes died. The autopsy opined that she died of "Complications of Starvation and Dehydration." The manner of death was suicide.

B

The Estate filed this action against Lake County, Sheriff Curran, Hunter, Fitch, CCS, Dr. Elazegui, Dr. Singh, Bibbiano, and two more social workers, Ruth Muuru and Edith Jones. It raised due process claims under 42 U.S.C. § 1983, state statutory and common law tort claims, violations of international treaty obligations, and claims under the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* Only the claims against the medical defendants went to trial.

But the jury never had the opportunity to resolve some of those claims. At the close of the Estate's presentation of evidence, the court entered judgment as a matter of law under Rule 50(a) for social workers Muuru and Jones on all claims against them. The court also concluded that the Estate had failed to present enough evidence to reach the jury on the question whether the medical defendants caused Gomes's death; it therefore granted them judgment as a matter of law on that part of the case. The only question remaining for the jury was the Estate's due process claim for inadequate medical care, limited to the pain and suffering Gomes experienced while in the Jail. The jury failed to reach a unanimous verdict regarding the conduct of Dr. Elazegui and Dr. Singh but it held social worker Bibbiano liable. It awarded the Estate

$119,000 in compensatory damages, which Bibbiano has paid in full.

The Estate does not challenge the jury verdict, but it takes issue with four aspects of the proceedings below: first, the district court's dismissal of the County defendants; second, the judgment as a matter of law on causation of death; third, the court's ruling barring the Estate from pursuing one of its theories of recovery under the Due Process Clause; and fourth, the court's instruction on the applicable legal standard. While we find no merit in its first point, we conclude on the latter three that the Estate is entitled to the opportunity to try its full case against the medical defendants before a jury.

## II

### A

We start with the Estate's attempt to revive some of the claims against the County defendants. It first challenges the district court's conclusion that the Jail's chief, Hunter, and liaison, Fitch, were not deliberately indifferent to Gomes's inadequate medical care in violation of her due process rights. We need not delve into the nuances of the standard for such a claim, because the Estate faces an insurmountable hurdle independent of that standard. We have long recognized the fact that correctional institutions (like most entities in a modern economy) engage in the division of labor. See *Greeno v. Daley*, 414 F.3d 645, 656 (7th Cir. 2005) (citation omitted). When detainees are under the care of medical experts, non-medical jail staff may generally trust the professionals to provide appropriate medical attention. *E.g.*, *Rice ex rel. Rice v. Corr. Med. Servs.*, 675 F.3d 650, 676, 678–79 (7th Cir. 2012); see also *Rasho*

*v. Elyea*, 856 F.3d 469, 478–79 (7th Cir. 2017) (holding that medical professionals were not liable when sued in their capacity as "prison administrators and policymakers, not treaters"). We will not find a jail official to have acted with deliberate indifference if she reasonably relied on the judgment of medical personnel. *E.g.*, *Greeno*, 414 F.3d at 655–56; *Estate of Perry v. Wenzel*, 872 F.3d 439, 458–59 (7th Cir. 2017). On the other hand, if jail officials had reason to know that their medical staff were failing to treat or inadequately treating an inmate, liability is possible. *King v. Kramer*, 680 F.3d 1013, 1018 (7th Cir. 2012); *Rice*, 675 F.3d at 676.

Nothing in this record justifies a finding of personal liability against the County defendants. Hunter and Fitch received assurances that CCS staff were regularly monitoring Gomes. They requested periodic updates on her condition. The medical providers informed Hunter and Fitch that Gomes was stable and promised to send her to the hospital if necessary. Knowing that the CCS employees were on the case, Hunter and Fitch were entitled to rely on their professional judgments. See *Arnett v. Webster*, 658 F.3d 742, 756 (7th Cir. 2011) ("This is not a case where [the plaintiff] was being completely ignored by medical staff."). The fact that they expressed concern about Gomes's condition and tried directly and indirectly to get her to eat does not make them culpable.

Because we find that Fitch and Hunter's reasonable reliance on their medical providers shields them from liability under section 1983, we need not consider the County defendants' alternative arguments for dismissal.

B

While the Estate has apparently abandoned its claim that Sheriff Curran is individually liable for Gomes's inadequate medical care, it is still trying to pursue an official-capacity claim about the Jail's allegedly deficient hunger-strike policy. As an Illinois sheriff, Curran has final policymaking authority over jail operations. *DeGenova v. Sheriff of DuPage Cnty.*, 209 F.3d 973, 976 (7th Cir. 2000). He is thus a proper party for a claim under *Monell v. Department of Social Services of New York*, 436 U.S. 658, 690–91 (1978), targeted at policies and customs that deprive inmates of their federal rights. *Id. Monell* liability is possible even if no individual official is found deliberately indifferent. *Glisson v. Ind. Dep't of Corr.*, 849 F.3d 372, 379 (7th Cir. 2017) (*en banc*).

The focus of the Estate's *Monell* claim is Lake County Jail's hunger-strike policy. That policy required four things: (1) the immediate notification of medical staff when an inmate begins a hunger strike; (2) documentation of meal refusals and immediate notification of a command officer after an inmate's third consecutive meal refusal; (3) the command's investigation and communication with medical staff as needed; and (4) a conference including the health services administrator and the chief or deputy chief of corrections about the best course of action. The Estate finds the policy lacking in some respects, including the timing of notification and consultation, follow-up procedures if the hunger strike continues, methods to review past suicidality, and guidance on what to look for and how to document an inmate's condition on suicide watch.

The Estate's concerns may be valid, but it has not shown that the Sheriff was deliberately indifferent in enacting this

policy. Though hunger strikes may be common in jails, as *amici* suggest, Gomes went longer without food and water than anyone else in the Jail's experience. This does not give the Sheriff a free pass, since a single incident can be enough for liability where a constitutional violation was highly foreseeable. *Woodward v. Corr. Med. Serv. of Ill., Inc.*, 368 F.3d 917, 929 (7th Cir. 2004) (rejecting the notion of a "'one free suicide' pass"). But this is not a case in which the Jail knew that hunger strikes were a risk yet did nothing. It had a system in place, and that system included a series of reasonable measures.

The Estate presented no evidence that would allow a trier of fact to conclude that some feature in the Jail's policy caused Gomes's death. Once Jail staff learned about her refusal to eat or drink, they stayed in regular communication with CCS's medical personnel. See *Belbachir v. Cnty. of McHenry*, 726 F.3d 975, 983 (7th Cir. 2013). It is unclear whether anyone connected the dots between Gomes's suicidal statements in October and her condition in December, but that is irrelevant because staff identified Gomes as actively suicidal almost from the start of her second detention. There is no reason to think that additional guidance in the hunger-strike policy would have made a difference in Gomes's deterioration. Summary judgment was appropriate on this *Monell* claim.

C

We can be brief with the Estate's complaint that the County defendants failed to comply with their international treaty obligations. Article 36 of the Vienna Convention guarantees a foreign national the right to have her home country's consular office notified when she is detained. Vienna Convention on Consular Relations, art. 36, Apr. 24, 1963, 21 U.S.T. 77; *Sandoval v. United States*, 574 F.3d 847, 850 (7th Cir. 2009).

When Gomes, an Indian national, was detained in October, ICE officials informed her of her Article 36 rights. No one repeated this advice when Gomes was taken back into custody in December. Still, we think summary judgment is appropriate, though for reasons different from those mentioned by the district court.

The district court was concerned that the Estate failed to mention section 1983 when raising this claim, see *Jogi v. Voges*, 480 F.3d 822, 825 (7th Cir. 2007) (*Jogi II*), but "complaints need not plead legal theories," and so that alone does not support dismissal, see *id.* at 826. Another strike against the Estate, according to the district court, was the lack of evidence connecting Gomes's death with the failure to notify. Indeed, when given the opportunity to speak with the Indian consulate in October, Gomes chose not to do so. Nonetheless, we have yet to explore the question whether a plaintiff is required to show actual harm in order to recover for an Article 36 violation, or if this is more in the nature of a failure to receive required *Miranda* warnings.

We need not wrestle with that issue now, however, because our case is easily resolved on the more straightforward ground of qualified immunity. The County officials are immune from suit if it was not clearly established in 2011 that their conduct violated the Vienna Convention. See *Pearson v. Callahan*, 555 U.S. 223, 245 (2009). Article 36 charges "competent authorities" with notifying foreign nationals. The term "competent authorities" includes booking officers. *Mordi v. Zeigler*, 770 F.3d 1161, 1166–1167 (7th Cir. 2014). Consistent with this precedent, the Jail's written policy places the notification obligation exclusively with booking officers. But the Estate did not sue the officer who booked Gomes. And, as we

acknowledged in 2014, the boundaries of who else might qualify as a competent authority have "yet to be fixed." *Mordi*, 770 F.3d at 1167. Because it was not clearly established who, beyond the booking officer, had a duty to inform Gomes of her consular rights, the County defendants are entitled to qualified immunity.

D

The Estate also seeks to reinstate a *Monell* claim based on the County's alleged failure to train Jail staff to notify detainees of their consular rights. A failure-to-train claim is actionable only if the failure amounted to deliberate indifference to the rights of others. *City of Canton v. Harris*, 489 U.S. 378, 388 (1989). Deliberate indifference exists where the defendant (1) failed "to provide adequate training in light of foreseeable consequences"; or (2) failed "to act in response to repeated complaints of constitutional violations by its officers." *Sornberger v. City of Knoxville*, 434 F.3d 1006, 1029–30 (7th Cir. 2006). In essence, the defendant must have actual or constructive notice of a problem. See *Robles v. City of Fort Wayne*, 113 F.3d 732, 735 (7th Cir. 1997).

Here, Sheriff Curran had neither. The Estate points to no evidence indicating that detainees repeatedly complained about the absence of consular notification. The parties try to paint the problem as rampant or nonexistent, but the record does not support either extreme.

Sheriff Curran did not fail to act in the face of foreseeable violations. Lake County Jail has had a policy about consular notification since at least October 2005. In addition to requiring booking officers to inform detainees, the policy specified that all officers who work at the booking desk "shall receive

appropriate training," including a video, handouts, and a training session. Sheriff Curran testified that he knew about this policy and was never notified that it was not being followed. Thus, at most, Sheriff Curran was negligent in failing to ensure that the Jail's training protocol was being implemented. This is not enough to establish that he was deliberately indifferent to detainees' rights. See *Rice*, 675 F.3d at 675 (requiring that "the failure to train reflect[] a conscious choice among alternatives"). The Sheriff did not display deliberate indifference, and so we need not consider the County defendants' alternative arguments.

## III

We turn now to the Estate's claims against Drs. Elazegui and Singh, which the district court partially blocked on the ground that there was not enough evidence of causation to reach the jury. Though the Estate assigns error to the court's ruling on a motion *in limine* and its jury instruction, we need reach these decisions only if we reverse on causation. This is because neither ruling prejudiced the Estate on the claim that did go to the jury. Under the single recovery rule, defendants are jointly and severally liable for the full amount of compensatory damages that result from an indivisible harm; a plaintiff can recover only once for those damages. *Janusz v. City of Chi.*, 832 F.3d 770, 774, 777 (7th Cir. 2016); *Minix v. Canarecci*, 597 F.3d 824, 829–30 (7th Cir. 2010). The Estate has already been fully compensated for Gomes's suffering at the Jail, since Bibbiano paid the assessed $119,000. It has not, however, received any compensation for Gomes's death. We thus turn to the question whether that issue too should have gone to the jury.

A

The court granted judgment as a matter of law on the Estate's constitutional and state-law wrongful death claims against Drs. Elazegui and Singh because it thought that no rational jury could conclude that their actions caused Gomes's death. It identified two evidentiary gaps: first, the lack of expert testimony explaining what the notation of "Complications of Starvation and Dehydration" in the autopsy report meant and how those complications related to Gomes's death; and second, the lack of expert testimony about what took place during the five days between Gomes's transfer to the hospital and her death. We consider this decision *de novo*. *Holder v. Ill. Dep't of Corr.*, 751 F.3d 486, 490 (7th Cir. 2014).

We start with the Estate's claim under the Fourteenth Amendment's Due Process clause for inadequate medical care.[1] Although Dr. Elazegui and Dr. Singh were employed by a private company that contracted with Lake County to provide detainees' medical care, they are considered state actors amenable to suit under section 1983. *West v. Atkins*, 487 U.S. 42, 54–56 (1988). They are not, however, entitled to qualified immunity. *Petties v. Carter*, 836 F.3d 722, 734 (7th Cir. 2016) (*en banc*). Moreover, they concede both that Gomes's medical condition was objectively serious and that the evidence would have permitted the jury to conclude the doctors acted with

---

[1] We do so because this was the claim that supports the district court's subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343; the Estate relied on the court's supplemental jurisdiction, 28 U.S.C. § 1367, for its state-law theories. It is possible that the alienage branch of diversity jurisdiction may also have existed, see 28 U.S.C. § 1332(a)(2), but this was not explored.

deliberate indifference. Our focus is thus exclusively on causation.

To recover on its due process claim, the Estate had to present "'verifying medical evidence' that the delay" in medical care "caused some degree of harm." *Williams v. Liefer*, 491 F.3d 710, 715 (7th Cir. 2007) (citation omitted). It did not, however, bear the burden of proving that but for the medical defendants' inaction, Gomes would definitely have lived. It would have been enough for the Estate to show that the resulting harm was a diminished chance of survival. See *Murrey v. United States*, 73 F.3d 1448, 1453–54 (7th Cir. 1996); *Holton v. Mem'l Hosp.*, 176 Ill. 2d 95, 119 (1997) (recognizing the lost chance doctrine in Illinois). While expert testimony could be used as "verifying medical evidence," medical records alone could suffice. *Grieveson v. Anderson*, 538 F.3d 763, 779 (7th Cir. 2008); *Williams*, 491 F.3d at 715.

The record contains ample evidence from which a jury could infer that Drs. Elazegui and Singh's inaction diminished Gomes's chances of survival. First, it shows that she died from starvation and dehydration. Under Illinois law, autopsy reports are *prima facie* evidence of their findings and conclusions, including cause of death. 725 ILCS 5/115-5.1. The report here did not mince words about Gomes's cause of death—"Complications of Starvation and Dehydration"—or her manner of death—"suicide." The coroner implicitly ruled out the possibility that Gomes died from any hospital-based illnesses or other causes. The report is clear: not eating or drinking caused her death. (Hospital records underscore this conclusion. On the day she arrived at the hospital, Gomes was already experiencing acute liver and renal failure. For present purposes, however, we disregard these records, because they

were excluded from trial at the request of the medical defend-
ants, and the Estate has not challenged that exclusion on ap-
peal.)

Moreover, the Estate's expert witnesses testified that the
doctors' failure to transfer Gomes to the hospital sooner al-
lowed her deterioration to reach a dangerous point. Psychia-
try expert Dr. James Gilligan repeatedly testified that
Dr. Singh contributed to Gomes's death by failing to initiate
her transfer from the Jail to the hospital. Furthermore,
Dr. Singh (a psychiatrist, recall) knew that Gomes was clini-
cally incompetent, but he took no steps to treat her even
though she was endangering her life. Dr. Gilligan concluded
that Dr. Singh's "failure to act … contributed to [Gomes's]
death." Internal medicine expert Dr. Jack Raba testified that
Gomes's pulse on December 25 was an "ominous sign," rais-
ing the possibility of cardiovascular problems, electrolyte or
metabolic imbalances, or renal failure. He added that Gomes's
blood pressure clearly indicated dehydration. Dr. Raba said it
was "impossible" not to consider that Gomes was starting to
show signs of organ failure. These "absolute signs" signaled
that Gomes urgently needed to be admitted to a hospital for
bloodwork and possibly forced feeding and medication.
Dr. Raba concluded that Dr. Elazegui's failure to intervene
"contributed to [Gomes's] ultimate demise and death."

The prison doctors' testimony lent support to Dr. Raba's
expert opinion on causation. When Dr. Elazegui spoke with
Gomes on December 22, he informed her that starvation
risked organ failure and death. He asked to be informed when
her weight loss hit 18%, since that number indicates an in-
creased risk of organ failure. Dr. Kim's testimony was also rel-

evant to the causation question. When he returned from vacation, he was concerned that Gomes could go into respiratory failure or cardiac arrest at any minute (and unlike the others, he promptly acted on this concern).

Taken together, this evidence was enough to support an inference on the jury's part that the delay in sending Gomes to the hospital resulted in her death, or at least lessened her chance of survival.

Our analysis applies with equal force to the Estate's state malpractice claims. See 740 ILCS 180/1. Under this theory, the Estate had to show that the physicians' negligent failure to comply with the standard of care proximately caused Gomes's injury. See *Sullivan v. Edward Hosp.*, 209 Ill. 2d 100, 112 (2004). In Illinois, proximate cause "must be established by expert testimony to a reasonable degree of medical certainty." *Morisch v. United States*, 653 F.3d 522, 531 (7th Cir. 2011) (citation omitted). An expert's opinion on the connection between a delay in treatment and injury must be factually supported in order to be submitted to the jury. *Wiedenbeck v. Searle*, 385 Ill. App. 3d 289, 293–94 (2008).

The proximate-cause inquiry encompasses both cause-in-fact and legal cause. *Palay v. United States*, 349 F.3d 418, 432 (7th Cir. 2003). For there to be legal cause, a reasonable person must have been able to foresee that the plaintiff's injury would result from his conduct. *Id.* For cause-in-fact, the plaintiff must show that but for the defendant's conduct, the injury would not have occurred. *Id.* Again, the injury can be the decedent's lost chance at survival. *Holton*, 176 Ill. 2d at 119.

A jury would have been permitted to find legal cause here. By their own admission, Drs. Elazegui and Singh knew that if

Gomes continued to refuse food and fluids, she could die. They warned her as much. The record also contained support for cause-in-fact. The experts opined that the medical defendants' inaction contributed to Gomes's death. This was not impermissibly conclusory for an expert opinion. See FED. R. EVID. 705; see also *Wilson v. Clark*, 84 Ill. 2d 186, 196 (1981) (adopting Federal Rule of Evidence 705 for Illinois). The medical defendants are right that an expert's testimony in a malpractice case cannot be based on "sheer, unsubstantiated speculation." *Wiedenbeck*, 385 Ill. App. 3d at 293. But the opinions here suffered from no such flaw, and the defendants were free to cross-examine the experts about what led them to draw their conclusions. *Wilson*, 84 Ill. 2d at 194. Based on Drs. Raba and Gilligan's expert testimony, a jury could have found that the defendants' inaction more likely than not contributed to Gomes's decreased chance of survival and her ultimate death. The Estate is entitled to a new trial in which it can present these arguments to a jury.

B

Since the Estate is entitled to a new trial against the medical defendants, we will also say a few words about its challenge to the district court's decision to bar all reference to the theory that the medical defendants violated the Due Process Clause by failing to protect Gomes from harming herself. Our review is for abuse of discretion. *Perry v. City of Chi.*, 733 F.3d 248, 252 (7th Cir. 2013).[2]

---

[2] Once again, it is worth recalling that a person may recover only once for a given set of injuries. At this stage, however, no one has had any occasion to consider whether state law and federal law overlap so much that the elements supporting each theory are the same, or that full relief could

The Supreme Court has declared that "competent persons" have a due-process "right to refuse lifesaving hydration and nutrition." *Washington v. Glucksberg*, 521 U.S. 702, 723 (1997) (quoting *Cruzan v. Dir., Mo. Dep't of Health*, 497 U.S. 261, 279 (1990)). But this right does not extend to incarcerated persons who have been deemed incompetent. *Freeman v. Berge*, 441 F.3d 543, 546 (7th Cir. 2006). For these detainees, jails have a duty "to prevent the prisoner from giving way" to the "unusual psychological strain" caused by incarceration. *Id.* at 547.

We repeatedly have recognized a jail or prison official's failure to protect an inmate from self-harm as one way of establishing deliberate indifference to a serious medical need. *E.g.*, *Estate of Miller, ex rel. Bertram v. Tobiasz*, 680 F.3d 984, 989–90 (7th Cir. 2012); *Collins v. Seeman*, 462 F.3d 757, 760–61 (7th Cir. 2006). The obligation to intervene covers self-destructive behaviors up to and including suicide. *Rice*, 675 F.3d at 665; *Cavalieri v. Shepard*, 321 F.3d 616, 620–22 (7th Cir. 2003). The duty applies "when suicide takes the form of starving oneself to death." *Freeman*, 441 F.3d at 547; accord *Rodriguez v. Briley*, 403 F.3d 952, 953 (7th Cir. 2005).

In barring this theory, the court reasoned that the Estate had not presented evidence that Gomes's suicidal ideation and mental illness were "so acute" that the defendants should have known about them and protected her from herself. See Seventh Circuit Pattern Civil Jury Instruction 7.19 (rev. 2017) (an element of a failure-to-protect-from-self-harm claim is that the defendant was aware or strongly suspected a strong likelihood of serious self-harm). The court attached particular

---

be recovered under either. Reconciliation of those theories is something better done by the district court on remand.

weight to testimony from Gomes's family members and the administrator that she was a devout Catholic who had no history of mental illness and would not have committed suicide.

In the past, we have taken into account jail officials' knowledge of a decedent's mental health history or warnings from family members, as that information pertains to the defendants' subjective awareness of a problem. *E.g.*, *Payne for Hicks v. Churchich*, 161 F.3d 1030, 1042 (7th Cir. 1998). But that is not the use to which the court put the testimony of Gomes's family. It jumped from the fact that Gomes was a Catholic to an assumption that the defendants were aware of her religious affiliation, but there is no evidence that they knew any such thing. Furthermore, mental illness and suicide regrettably afflict devout members of all religious groups. While a jury could consider testimony from Gomes's family when assessing this theory of recovery, it was not the court's role to accept the family opinion as an undisputed fact.

And in any event, the trial record was filled with evidence supporting a finding that the medical defendants knew that Gomes was at great risk of death by starvation and dehydration, and that she was unable to think rationally. On December 27, Dr. Singh deemed her not competent and concluded that she did not understand the risks of refusing to eat. Before then, CCS staff documented Gomes's suicidal ideation and placed her on suicide watch. Dr. Elazegui had warned Gomes that if she continued to refuse nutrition, she could die. The defendants' records reveal that they were aware that Gomes was at serious risk of causing her own death. The district court abused its discretion by prohibiting the Estate from pursuing this line of argument. At the next trial, the Estate must be allowed to argue this theory of recovery to the jury.

C

Finally, we consider whether the district court properly instructed the jury on intent. We evaluate the jury instructions anew when deciding if they accurately state the law. *Sanchez v. City of Chi.*, 880 F.3d 349, 355 (7th Cir. 2018).

The Supreme Court first recognized an incarcerated person's right to receive adequate medical treatment in *Estelle v. Gamble*, 429 U.S. 97 (1976), which concerned a convicted prisoner. In that case, the Court concluded that deliberate indifference to a prisoner's serious medical need violates the Eighth Amendment's protection against cruel and unusual punishment. *Id.* at 104–05. The "deliberate indifference" standard requires a showing that the defendant had a "sufficiently culpable state of mind" and asks whether the official actually believed there was a significant risk of harm. *Pittman ex rel. Hamilton v. Cnty. of Madison*, 746 F.3d 766, 775–76 (7th Cir. 2014).

This subjective standard is closely linked to the language of the Eighth Amendment, which prohibits the infliction of "cruel and unusual *punishments*." The Supreme Court has interpreted this to ban only the "unnecessary and wanton infliction of pain." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). The Court has applied the deliberate-indifference standard not just to medical-care problems, but also to other types of claims. See *Farmer*, 511 U.S. at 837 (failure-to-protect); *Wilson v. Seiter*, 501 U.S. 294, 303 (1991) (conditions of confinement).

Pretrial detainees stand in a different position: they have not been convicted of anything, and they are still entitled to the constitutional presumption of innocence. Thus, the pun-

ishment model is inappropriate for them. *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2475 (2015) ("[P]retrial detainees (unlike convicted prisoners) cannot be punished at all, much less 'maliciously and sadistically.'" (citations omitted)); *Bell v. Wolfish*, 441 U.S. 520, 535 (1979) ("For under the Due Process Clause, a detainee may not be punished prior to an adjudication of guilt in accordance with due process of law."). Yet they also are protected from certain abusive conditions. The difference is that the claims of state detainees being held on probable cause arise under the Fourteenth Amendment's Due Process Clause. *Collins v. Al-Shami*, 851 F.3d 727, 731 (7th Cir. 2017).

That said, we have typically assessed pretrial detainees' medical care (and other) claims under the Eighth Amendment's standards, reasoning that pretrial detainees are entitled to at least that much protection. *E.g.*, *Minix*, 597 F.3d at 831; *Board v. Farnham*, 394 F.3d 469, 477–78 (7th Cir. 2005). In conducting this borrowing exercise, we have grafted the Eighth Amendment's deliberate indifference requirement onto the pretrial detainee situation. *Cavalieri*, 321 F.3d at 620. Missing from this picture has been any attention to the difference that exists between the Eighth and the Fourteenth Amendment standards.

The Supreme Court recently disapproved the uncritical extension of Eighth Amendment jurisprudence to the pretrial setting in *Kingsley v. Hendrickson*, 135 S. Ct. 2466 (2015). There the Court held that a pretrial detainee bringing an excessive-force claim did not need to prove that the defendant was *subjectively* aware that the amount of force being used was unreasonable. *Id.* at 2472–73. Rather, the plaintiff needed only to show that the defendant's conduct was *objectively* unreasonable. *Id. Kingsley*, it is worth emphasizing, was a Fourteenth

Amendment Due Process case. Indeed, the Court took pains
to reiterate the basic principles that apply to pretrial detain-
ees:

> Several considerations have led us to conclude that the
> appropriate standard for a pretrial detainee's excessive
> force claim is solely an objective one. For one thing, it
> is consistent with our precedent. We have said
> that "the Due Process Clause protects a pretrial de-
> tainee from the use of excessive force that amounts to
> punishment." *Graham [v. Connor*, 490 U.S. 386,] 395,
> n. 10 [1989]. And in *Bell [v. Wolfish*, 441 U.S. 520
> (1979)], we explained that such "punishment" can con-
> sist of actions taken with an "expressed intent to pun-
> ish." 441 U.S., at 538. But the *Bell* Court went on to ex-
> plain that, in the absence of an expressed intent to pun-
> ish, *a pretrial detainee can nevertheless prevail by showing
> that the actions are not "rationally related to a legitimate
> nonpunitive governmental purpose" or that the actions
> "appear excessive in relation to that purpose." Id.,* at
> 561.

135 S. Ct. at 2473 (emphasis added).

Though *Kingsley*'s direct holding spoke only of excessive-
force claims, two of our sister circuits have held that its logic
is not so constrained. The Ninth Circuit first extended *Kings-
ley*'s objective inquiry to detainees' Fourteenth-Amendment
failure-to-protect claims. *Castro v. Cnty. of L.A.*, 833 F.3d 1060,
1070–71 (9th Cir. 2016) (*en banc*), *cert. denied*, 137 S. Ct. 831
(2017). Since then, that court has applied the *Kingsley* holding
more broadly to a medical-need claim brought by a pretrial
detainee. *Gordon v. Cnty. of Orange*, 888 F.3d 1118, 1120, 1122–
25 (9th Cir. 2018). The Second Circuit followed suit, applying

the objective standard to detainees' Fourteenth-Amendment complaints about their conditions of confinement; in the process it overruled a decision applying a subjective test to a medical-care claim. *Darnell v. Pineiro*, 849 F.3d 17, 34–35 (2d Cir. 2017) (overruling *Caiozzo v. Koreman*, 581 F.3d 63 (2d Cir. 2009)); see *Wilson*, 501 U.S. at 303 (medical care is a condition of confinement). Later, the Second Circuit expressly applied an objective standard to a claim of deliberate indifference to a serious medical condition. *Bruno v. City of Schenectady*, No. 16-1131, 2018 WL 1357377, at *2–*3 (2d Cir. Mar. 16, 2018) (unpublished) (asking "whether a 'reasonable person' would appreciate the risk to which the detainee was subjected"). Other courts of appeals have contemplated the same reading of *Kingsley*. *Richmond v. Huq*, 885 F.3d 928, 938 n.3 (6th Cir. 2018) (not applying *Kingsley*, which neither party raised, but recognizing the "shift in Fourteenth Amendment deliberate indifference jurisprudence [that] calls into serious doubt whether [the plaintiff] need even show that the individual defendant-officials were subjectively aware of her serious medical conditions and nonetheless wantonly disregarded them").

The Eighth, Eleventh, and Fifth Circuits have chosen to confine *Kingsley* to its facts—that is, to Fourteenth-Amendment claims based on excessive-force allegations in a pretrial setting. *E.g.*, *Whitney v. City of St. Louis*, 887 F.3d 857, 860 n.4 (8th Cir. 2018); *Dang by & through Dang v. Sheriff, Seminole Cnty.*, 871 F.3d 1272, 1279 n.2 (11th Cir. 2017); *Alderson v. Concordia Parish Corr. Facility*, 848 F.3d 415, 419 n.4 (5th Cir. 2017) (following circuit precedent and concluding that the issue was not directly raised). It is worth noting, however, that a concurring judge in *Alderson* advocated reconsideration of the

subjective standard to detainees' other claims in light of *Kingsley*. *Id.* at 424–25 (Graves, J., specially concurring in part).

Some circuits have continued to analyze inadequate medical treatment claims under the deliberate indifference standard without grappling with the potential implications of *Kingsley*. *E.g.*, *Duff v. Potter*, 665 F. App'x 242, 244–45 (4th Cir. 2016) (applying the objective reasonableness standard to a detainee's excessive-force claim but not his medical-need claim, which it affirmed on forfeiture grounds).

We have not yet expressly weighed in on the debate. Since *Kingsley*, we have continued to duplicate the Eighth Amendment inquiry for claims of deficient medical treatment. *E.g.*, *Phillips v. Sheriff of Cook Cnty.*, 828 F.3d 541, 554 n.31 (7th Cir. 2016). But we have acknowledged that *Kingsley* has "called into question" our case law treating the "protections afforded by" the Eighth and Fourteenth Amendments as "'functionally indistinguishable' in the context of a claim about inadequate medical care." *Smego v. Jumper*, 707 F. App'x 411, 412 (7th Cir. 2017); accord *Collins*, 851 F.3d at 731.

Because the answer may make a difference in the retrial of Gomes's claims, we think it appropriate to address the proper standard at this time. We begin with the fact that the Supreme Court has been signaling that courts must pay careful attention to the different status of pretrial detainees. In this respect, *Kingsley* does not stand alone. See, *e.g.*, *Manuel v. City of Joliet*, 137 S. Ct. 911 (2017) (allowing Fourth Amendment challenges to pretrial detention even beyond the start of legal process). The Court has cautioned that the Eighth Amendment and Due Process analyses are not coextensive. See *Kingsley*, 135 S. Ct. at 2475 ("The language of the two Clauses differs, and the nature of the claims often differs."); *Currie v. Chhabra*,

728 F.3d 626, 630 (7th Cir. 2013) ("[D]ifferent constitutional provisions, and thus different standards, govern depending on the relationship between the state and the person in the state's custody."). We see nothing in the logic the Supreme Court used in *Kingsley* that would support this kind of dissection of the different types of claims that arise under the Fourteenth Amendment's Due Process Clause. To the contrary, the Court said that "[t]he language of the [Eighth and Fourteenth Amendments] differs, and the nature of the claims often differs. And, most importantly, pretrial detainees (unlike convicted prisoners) cannot be punished at all, much less 'maliciously and sadistically.'" 135 S. Ct. at 2475 (citations omitted). We thus conclude, along with the Ninth and Second Circuits, that medical-care claims brought by pretrial detainees under the Fourteenth Amendment are subject only to the objective unreasonableness inquiry identified in *Kingsley*.

Although the defendants failed to mention *Parratt v. Taylor*, 451 U.S. 527 (1981), *overruled in part on other grounds by Daniels v. Williams*, 474 U.S. 327, 330–31 (1986), and thus have forfeited any argument based on that case, we see nothing in *Parratt* that points in the opposite direction. There the Supreme Court held that plaintiffs may not bring claims under the Due Process Clause where state law provides an adequate remedy. 451 U.S. at 543–44. Though the Estate has brought state malpractice claims in addition to its due-process claim, the availability of parallel and even overlapping forms of recovery does not doom its constitutional claim. See *Zinermon v. Burch*, 494 U.S. 113, 124 (1990); *Armstrong v. Daily*, 786 F.3d 529, 539 (7th Cir. 2015). *Parratt* applies only to certain procedural-due-process claims. The violation of which the Estate complains derives from the substantive aspect of the Due Process Clause. See *Youngberg v. Romeo*, 457 U.S. 307, 315–16

(1982); see also *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983); *Collignon v. Milwaukee Cnty.*, 163 F.3d 982, 988 (7th Cir. 1998). In this situation, there is no amount of process that would justify a decision to sit by and leave serious medical needs unattended. *Parratt* is thus beside the point.

We also see no conflict between this application of *Kingsley* and the Supreme Court's later decision in *Daniels v. Williams*, 474 U.S. 327 (1986). *Daniels* overruled part of *Parratt* and held (or underscored) that negligent conduct does not offend the Due Process Clause. *Id.* at 330–31. The defendants here worry that an objective-reasonableness standard will impermissibly constitutionalize medical malpractice claims, because it would allow mere negligence to suffice for liability. A careful look at *Kingsley*, however, shows that this is not the case; the state-of-mind requirement for constitutional cases remains higher.

Here is what the Court had to say about this problem in *Kingsley*:

> We consider a legally requisite state of mind. In a case like this one, there are, in a sense, two separate state-of-mind questions. The first concerns the defendant's state of mind with respect to his physical acts—*i.e.,* his state of mind with respect to the bringing about of certain physical consequences in the world. The second question concerns the defendant's state of mind with respect to whether his use of force was "excessive." Here, as to the first question, there is no dispute. As to the second, whether to interpret the defendant's physical acts in the world as involving force that was "excessive," there is a dispute. We conclude with respect to that question that the relevant standard is objective

> not subjective. Thus, the defendant's state of mind is
> not a matter that a plaintiff is required to prove.

135 S. Ct. at 2472. As applicable here, the first of those inquiries asks whether the medical defendants acted purposefully, knowingly, or perhaps even recklessly when they considered the consequences of their handling of Gomes's case. See *id.* at 2472, 2474 (discussing purposeful or knowing conduct and leaving open the possibility that recklessness would also suffice). The courts of appeals that have applied *Kingsley* to detainees' claims in contexts other than excessive force have taken that step, while continuing to recognize that it will not be enough to show negligence or gross negligence. *Gordon*, 888 F.3d at 1125 (under *Kingsley*, a detainee must "prove more than negligence but less than subjective intent—something akin to reckless disregard" (quoting *Castro*, 833 F.3d at 1071)); accord *Darnell*, 849 F.3d at 36 & n.16. As *Kingsley* instructs, the second step is the objective one.

The allegations here easily fit the mold of *Gordon*, *Darnell*, and *Castro*. A properly instructed jury could find that Drs. Elazegui and Singh made the decision to continue observing Gomes in the jail, rather than transporting her to the hospital, with purposeful, knowing, or reckless disregard of the consequences. (The jury could also reject such a conclusion.) It would be a different matter if, for example, the medical defendants had forgotten that Gomes was in the jail, or mixed up her chart with that of another detainee, or if Dr. Elazegui forgot to take over coverage for Dr. Kim when he went on vacation. Such negligence would be insufficient to support liability under the Fourteenth Amendment, even though it might support state-law liability. Here, there is evidence that Drs. Elazegui and Singh deliberately chose a "wait

and see" monitoring plan, knowing that Gomes was neither eating nor drinking nor competent to care for herself. See *Glisson*, 849 F.3d at 380, 382 (recognizing inaction as a choice). Because the Estate does not claim merely negligent conduct, a jury must decide whether the doctors' deliberate failure to act was objectively reasonable.

**IV**

Any death is a great loss, but one as preventable as Gomes's is especially disturbing. On this record, a jury could have found that the intentional and knowing inaction of Drs. Elazegui and Singh caused Gomes's death. We therefore REVERSE and REMAND for new trial of the Estate's claim against them, as it relates to Gomes's death. We AFFIRM the district court's grant of summary judgment to the County defendants.