In the

# United States Court of Appeals
## For the Seventh Circuit

No. 22-2958

BETTYE JACKSON, as Independent Administrator of the Estate of Eugene Washington, Deceased,

*Plaintiff-Appellant,*

*v.*

SHERIFF OF WINNEBAGO COUNTY, ILLINOIS, in his official capacity, and JEFF VALENTINE, individually and as agent,

*Defendants-Appellees.*

Appeal from the United States District Court for the
Northern District of Illinois, Western Division.
No. 20-cv-50414 — **Iain D. Johnston**, *Judge.*

ARGUED JUNE 2, 2023 — DECIDED JULY 20, 2023

Before FLAUM, BRENNAN, and ST. EVE, *Circuit Judges.*

FLAUM, *Circuit Judge.* Eugene Washington died while in custody as a pretrial detainee. As the administrator of his estate, Bettye Jackson brings a claim for delayed medical treatment against the officer responsible for monitoring Washington's housing unit at the time of his death. The district court

granted summary judgment for the officer, holding that Jackson had not established causation. We reverse and remand.

## I. Background

On October 28, 2019, Washington was a pretrial detainee at the Winnebago County Jail. At around 4:36 AM, Washington's cellmate, Lamar Simmons, awoke to the sound of Washington gasping for breath, arching his back with the effort, as he lay on his bunk. Simmons tried to shake Washington awake, but he did not respond.

At 4:37 AM, Simmons pressed the intercom button in the cell. The intercom allows inmates to contact the officer monitoring the control desk for the housing unit so they can report emergencies that occur at night, when officer presence around the cells is significantly reduced. Pressing the button triggers an audible ping and a flashing light at the control desk. Officers are trained to answer these calls as soon as possible. Communication over the intercom, though, can be difficult to understand. In those scenarios, multiple officers testified that they stay on the line and ask the inmate to speak more clearly until they can make out the nature of the report. Officers should of course respond promptly if there is a legitimate emergency, but inmates sometimes misuse the intercom for non-urgent purposes instead.

When Simmons pushed the intercom button, Jeff Valentine was the officer at the control desk. He did not answer the call for over one minute. When Valentine did answer, Simmons says he reported in a clear voice, "My cellie can't breathe." Valentine claims he had trouble understanding Simmons; he says he thought Simmons was referring to a plumb-

ing issue. According to Valentine, he asked Simmons to re-peat himself, but according to Simmons, Valentine told him the intercom is reserved for emergencies. Simmons says he responded, "Who hitting [*sic*] the button at this time at night and it ain't a medical emergency? My cellie can't breathe." Valentine claims he once more heard Simmons complain about the plumbing. He says it was at *this* point that he ad-monished Simmons the intercom is only for emergencies. Simmons, on the other hand, does not remember Valentine saying anything further during the call. Either way, Valentine then ended the call. It had lasted around thirty seconds.

Simmons kept trying to wake Washington to no avail. He pressed the intercom button again just before 4:47 AM, but Valentine did not answer for about ninety seconds. By the time Valentine did answer, two other officers had joined him at the control desk. Simmons repeated that Washington could not breathe and requested help. This time, Valentine says he understood Simmons was reporting a medical emergency, as did one of the other officers at the desk.

The two other officers ran to Washington's cell, arriving at approximately 4:50 AM. Simmons says that, in the interim, Washington's gasps had slowed. As he tells it, Washington took his last breath shortly before the officers reached the cell. Upon observing Washington's state—including that he did not have a detectable pulse—the officers issued a jail-wide alert for medical assistance. One officer began CPR. When more officers arrived, they moved Washington from his bed to the floor and continued CPR. A nurse with a defibrillator arrived at the cell around 4:52 AM. An officer attached the de-fibrillator to Washington's chest, and it recommended giving

an electrical shock. The nurse complied. Washington, however, remained unresponsive, so the personnel continued administering CPR and intermittent shocks.

At roughly 5:00 AM, emergency medical technicians (EMTs) arrived at the cell. They directed the officers to keep performing chest compressions while they prepared their equipment. Then, the EMTs attached a CPR machine to Washington's chest and wheeled him out of the cell. An officer who rode in the ambulance with Washington testified that the EMTs continued administering CPR en route to the hospital.

Despite these efforts, Washington was pronounced dead soon after reaching the hospital. Dr. Mark Peters performed an autopsy the next day. He concluded that sleep apnea caused Washington to go into cardiac arrhythmia, which in turn caused Washington's death.

Jackson, as the administrator of Washington's estate, brought this action under 18 U.S.C. § 1983, alleging that Valentine's delay in obtaining treatment harmed Washington.[1] The district court granted Valentine's motion for summary judgment on the grounds that Jackson had not presented sufficient evidence to show causation. Jackson now appeals.

## II. Discussion

Our review at summary judgment is de novo. *Stockton v. Milwaukee County*, 44 F.4th 605, 614 (7th Cir. 2022). Jackson is

---

[1] The Sheriff of Winnebago County is named as a co-defendant, but Jackson has dropped her § 1983 claim against him. Her other claims are not at issue in this appeal.

the nonmoving party, so she receives "the benefit of conflict-ing evidence and reasonable inferences." *Id.* That said, she must "produce evidence sufficient to establish [the] ele-ment[s] essential to" her claim. *Id.* "[I]f the evidence is such that a reasonable jury could return a verdict" in her favor, summary judgment is inappropriate. *Zaya v. Sood*, 836 F.3d 800, 804 (7th Cir. 2016) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

Valentine argues that Jackson has failed to carry her bur-den on two fronts: causation and the reasonableness of Valen-tine's conduct. We address each in turn.

### A. Causation

Jackson's delayed-medical-care claim is based on the roughly thirteen minutes that elapsed between Simmons's first call to Valentine and the arrival of jail personnel at the cell. She must show the delay itself "caused some degree of harm." *Williams v. Liefer*, 491 F.3d 710, 714–15 (7th Cir. 2007). To that end, Jackson argues that the delay "diminished [Washington's] chance of survival." *Miranda v. County of Lake*, 900 F.3d 335, 347 (7th Cir. 2018) (explaining that a plaintiff need not show that, "but for" the delay, the decedent "would definitely have lived"). She also contends that the delay pro-longed Washington's pain and suffering. *See Gil v. Reed*, 381 F.3d 649, 662 (7th Cir. 2004).

No matter the precise harm, the plaintiff needs to offer "verifying medical evidence" to establish a causal connection to the claimed delay. *Williams*, 491 F.3d at 714–15. Expert tes-timony counts towards this requirement, but so do other forms of evidence. *See Miranda*, 900 F.3d at 347–48. "[N]on-ex-pert evidence is sufficient as long as it permits the fact-finder

to determine whether the delay caused additional harm." *Ortiz v. City of Chicago*, 656 F.3d 523, 535 (7th Cir. 2011). It is the "rare" case that does not meet this threshold at summary judgment. *Gayton v. McCoy*, 593 F.3d 610, 624 (7th Cir. 2010). We only prevent a jury from deciding causation if "a plaintiff can proffer *no* evidence that a delay in medical treatment exacerbated an injury." *Id.* (emphasis added).

Whether Jackson has presented sufficient verifying medical evidence is the central inquiry of this case. We conclude that she has.

To start, there is evidence that Washington was alive during the delay. Simmons testified that Washington was gasping for air from the time Simmons awoke until around the time officers reached the cell. Later, the defibrillator recommended administering a shock. According to an officer trained to use the device, that means it detected electrical activity in Washington's heart. For summary-judgment purposes, this is enough to refute Valentine's assertion that Washington was "dead long before the guards arrived." *See Bass by Lewis v. Wallenstein*, 769 F.2d 1173, 1182–83 (7th Cir. 1985).[2]

Building off that point, Jackson cites testimony from Dr. Peters. During his deposition, Dr. Peters testified that cardiac arrhythmia caused by sleep apnea can lead to death "very fast or very slowly"; it can take "many minutes" for a person to

---

[2] The plaintiff in *Bass by Lewis* offered expert testimony that the decedent would have had a 10–30% chance of survival had resuscitative efforts been provided sooner. *Id.* at 1183–84. Jackson does not offer equivalent evidence here. As explained above, however, Jackson does not need such testimony to survive summary judgment. *See Ortiz*, 656 F.3d at 535.

reach "that fatal arrhythmic state." He added that, although Washington was "very likely … in an arrhythmia" when Simmons awoke and until his death, he had "no idea" whether Washington was in that state beforehand. Further, Dr. Peters had found congestion in Washington's lungs. He explained, "[T]he only time you don't see lung congestion is if a person dies pretty much instantaneously."

As Valentine notes, Dr. Peters never testified that earlier medical intervention would have made a difference. But he never ruled out the possibility either. Given the evidence that Washington was alive for several minutes following Simmons's first call, Dr. Peters's testimony indicating that death occurred over the course of minutes, and not instantaneously, supports Jackson's claim that the delay harmed Washington. *Cf. Walker v. Soo Line R. Co.*, 208 F.3d 581, 587 (7th Cir. 2000) (holding that a medical expert's testimony should have been admitted because it could help the jury infer causation even though the expert did not "have an opinion on that ultimate question").

What is more, Jackson's position aligns with evidence about the progression of Washington's symptoms. Simmons recalled that Washington's gasps became slower and slower following his *second* call to Valentine. His testimony thus suggests that Washington's condition increasingly declined during the delay. Indeed, had Valentine sent help in response to the *first* call, officers would have arrived before Washington's breaths slowed. Instead, jail personnel did not reach the cell until Washington had stopped breathing entirely. They still tried to resuscitate him—efforts the EMTs continued when they took over Washington's care even later. *See Miranda*, 900 F.3d at 348 (observing that a non-defendant doctor grew

"concerned" and "promptly acted" when he learned of the decedent's condition after the defendants had already delayed treatment). It would not be unreasonable to find that starting this treatment before Washington's condition had so deteriorated would have improved his odds of survival.

To be sure, Jackson "proceeded precariously" on this issue. *See Roe v. Elyea*, 631 F.3d 843, 865 (7th Cir. 2011). She would have been well served to buttress her claim with testimony from a medical expert directly addressing causation. All the same, the verifying medical evidence taken together could allow a reasonable jury to conclude that the delay diminished Washington's chances of survival. *Cf. Stockton*, 44 F.4th at 616 (holding that a delayed-treatment claim presented "one of those 'rare instance[s]' in which summary judgment based on causation is appropriate" because the "parties agree[d]" that, at the time of the officer's "failure to render CPR[,] … the last possible opportunity for medical intervention to save [the decedent's] life" had already passed (first alteration in original) (quoting *Gayton*, 593 F.3d at 624)).

On the other hand, Jackson has not carried her burden to the extent she presses a claim for Washington's prolonged suffering. She points to no verifying medical evidence indicating that Washington, who was apparently unconscious from the time Simmons awoke, could experience suffering or pain. *See Comollari v. Ashcroft*, 378 F.3d 694, 697 (7th Cir. 2004) ("[T]ort law confines the category of 'pain and suffering' to conscious pain and suffering ...."); *see also Wilson v. Flack*, No. 19-14294, 2022 WL 4477025, at *13 (11th Cir. Sept. 27, 2022). As such, any verdict premised on Washington's prolonged suffering would be unduly speculative. *See Lam v. Springs Window Fashions, LLC*, 37 F.4th 431, 436 (7th Cir. 2022).

Even so, Jackson has presented enough evidence at summary judgment to support her claim that the delay diminished Washington's chances of survival. We reverse the district court's holding to the contrary.

**B. Reasonableness of Valentine's Conduct**

We now turn to the reasonableness of Valentine's conduct—an issue the district court did not reach. Washington was a pretrial detainee, so Jackson's claim arises under the Fourteenth Amendment. *Miranda*, 900 F.3d at 350. Jackson must demonstrate that Valentine acted "purposefully, knowingly, or perhaps even recklessly" when considering the consequences of his conduct. *Id.* at 353 (citing *Kingsley v. Hendrickson*, 576 U.S. 389, 395–96, 400 (2015)). She must also show that his conduct was objectively unreasonable. *Id.* at 353–54. The latter inquiry draws on "the totality of the relevant facts and circumstances." *James v. Hale*, 959 F.3d 307, 318 (7th Cir. 2020).

The parties' disputes over this issue generally stem from their competing factual accounts. Thus, summary judgment would be inappropriate. *See, e.g., Ortiz*, 656 F.3d at 534 (explaining that "we do not weigh the proof, make credibility determinations, or resolve narrative disputes" at summary judgment); *Goelzer v. Sheboygan County*, 604 F.3d 987, 995 (7th Cir. 2010) (holding that "summary judgment is not appropriate" when faced "with two competing accounts, either of which a jury could believe").

For example, Valentine's explanation for not sending help in response to Simmons's first call boils down to his claim that he thought Simmons was complaining about the plumbing. In fact, Valentine notes that inmates often use the intercom for non-medical purposes. But some evidence—not the least of

which is Simmons's testimony about what he said during the call—supports Jackson's contention that Valentine knew Simmons was reporting a medical emergency. Valentine counters that Simmons cannot know for certain what he heard at his end of the intercom. A reasonable jury, however, could resolve this inconsistency in Jackson's favor. *See Ortiz*, 656 F.3d at 532. And if the jury credited Jackson's account, it could also conclude that Valentine acted with "purposeful, knowing, or reckless disregard of the consequences" as well as in an objectively unreasonable manner. *See Miranda*, 900 F.3d at 354.

Valentine's other arguments about the reasonableness of his conduct share the same weakness. As a result, summary judgment would be inappropriate on this basis too.

### III. Conclusion

For these reasons, we REVERSE the district court's grant of summary judgment and REMAND for further proceedings consistent with this opinion.[3]

---

[3] After granting summary judgment on the § 1983 claim, the district court relinquished its jurisdiction over Jackson's state-law claims. On remand, "the district court should revisit the question of supplemental jurisdiction." *Stockton*, 44 F.4th at 621 n.4.